## LOUIS M. RAFFEL
*vs.*
## SYDNEY BRODMAN

Superior Court        New Haven County        File No. 57193

MEMORANDUM FILED JUNE 18, 1940.

*Harrison & Harrison,* of New Haven, and *Omar W. Platt,* of Milford, for the Plaintiff.

*Ephraim E. Sinn,* of New Haven, for the Defendant.

INGLIS, J. There are, in the main, four questions involved in this case. They are first, as to whether the southerly or southeasterly boundary of the plaintiff's property is the mean high water mark of Long Island Sound; second, where that high water mark is; third, if the plaintiff does own to high water mark, do the defendants have any right either by grant or prescription to use the sandy beach above high water mark for bathing and other purposes; and, fourth, does the erection and maintenance of fences by the plaintiff across that sandy beach and along his easterly and westerly boundary lines violate the building zone regulations of the Town of Milford and, if so, what is the effect of such a violation.

1. Without going into the history of the plaintiff's title in great detail, it appears that his present holdings are the greater portion of two parcels owned at one time, the northern one by John Larkin and the southern one by Martha R. Hubbard and Laura E. Aston. On May 8, 1899, Larkin conveyed his piece to Samuel Halper, describing it as extending 90 feet southerly from the private road now known as Shell Avenue, and, on April 6, 1900, Hubbard and Aston conveyed the southern piece

to said Samuel Halper describing it as being bounded northerly
67½ feet by land of said Halper, easterly 40 feet more or less
by land of said Halper, southerly by waters of Long Island
Sound 67½ feet and westerly 40 feet more or less by a private
pathway. Incidentally, the Halper property lying just east of
this last described piece had also been acquired by him from
Martha R. Hubbard on February 21, 1899, and although the
north boundary of that piece was also a line 90 feet south from
Shell Avenue, and the southerly boundary is stated as the
"shore or beach and waters of Long Island Sound", the length
of the westerly line of that piece is given as being 30 feet more
or less. This is the same line which is given as 40 feet more or
less in the deed from Hubbard and Aston to Halper and the
fact of the discrepancy tends to indicate that the prime intent
of the parties was to convey to the waters of Long Island
Sound and that the length of the boundary lines as stated in
the deeds was very largely guesswork.

On April 2, 1925, Charles J. Halper, Jennie Halper Wolff
and Frances Halper Jacobs, who apparently were the heirs of
Samuel Halper, conveyed to Fannie Elbin (who in reality took
title for the benefit of the plaintiff) four pieces of land, the
first and fourth pieces as described in that deed less a strip
about three feet wide off the east side thereof being the present
property of the plaintiff. In that deed the southerly boundary
of the two pieces together is given as "by the shore and Waters
of Long Island Sound." In this deed the length of the east
and west lines of the southern piece with which we are now
concerned is not given in feet. This deed also purports to con-
vey certain easements to the sandy beach, which beach is itself
apparently included in the conveyance. This fact however,
does not tend to contradict the belief that the parties intended
to include that beach because those easements had in former
deeds been conveyed as appurtenant to the two northern pieces
fronting on Shell Avenue, and it is apparent that the scrivener
incorporated them in this deed from a superabundance of
caution.

After the purchase of the land by the plaintiff in the name
of Fannie Elbin, he had a map of the premises prepared. On
this map, dotted lines are used to indicate the boundaries of the
property on three sides. The dotted lines showing the side
boundaries of the lot extend on the south only to the sea
wall and are marked 131.1 and 132.8 (probably meaning feet)
respectively. It is significant however that no dotted line ap-

pears on the map to mark the south or southeast boundary of the property and therefore, on the map alone, it does not appear whether that boundary is intended to be the sea wall or Long Island Sound. The dimensions on the map may be intended to indicate either the length of the entire boundary as it actually was or simply the distance between the street and the sea wall.

Thereafter, on May 14, 1925, a deed conveyed title from Fannie Elbin to Tillie Raffel, the plaintiff's wife, and on February 21, 1928, she conveyed to the plaintiff himself. These latter conveyances both described the property as being the premises shown on the map and give the length of the northeasterly and southwesterly boundaries as 133.6 feet and 131.1 feet respectively (which would end those lines at the face of the sea wall), but they also describe the property as being bounded "Southeasterly by Long Island Sound."

From the above facts and all of the evidence in the case it is found that it was the intention of all of the parties to all of the deeds in the plaintiff's chain of title to make the physical boundary of "the waters of Long Island Sound" control over that part of the description which stated the length of the side lines of the property either in feet or by reference to the map. The boundary of the waters of Long Island Sound is a much more certain boundary than the vague statement of the length of the side lines in the earlier deeds. Clearly, therefore, Fannie Elbin took title to land down to those waters. *Smith vs. Dotolo,* 99 Conn. 241. Although in some cases a description by reference to a map may control over a description by fixed boundaries (*Barri vs. Schwarz Bros. Co.,* 93 Conn. 501), this would be only in a case where a portion of the land enclosed within the fixed boundary would be shown on the map to be included in a lot other than the lot conveyed to the party who was relying on the fixed boundary. In the present case the map referred to in the last two deeds in the plaintiff's chain does not show the strip of sandy beach between the sea wall and high water mark as being a part of some property other than the plaintiff's. On the contrary, it is probable that the map maker took the line of the sea wall as a matter of convenience and did not intend to exclude from the property the sandy beach which theretofore had been a portion of it. It is, therefore, clear that in the last two deeds, also, the fixed boundary of "the waters of Long Island Sound" should control over both the statement

of the length of the side lines of the property and also the reference to the map.

It is therefore, concluded that the plaintiff owns in fee to the waters of Long Island Sound, which means to mean high water mark thereof.

2. It is found that mean high water mark in front of the plaintiff's premises is the straight line between a point, in the plaintiff's southwesterly boundary line, eight feet southeasterly from the face of his sea wall and a point in his northeasterly boundary line $13\frac{1}{2}$ feet southeasterly from the face of his sea wall.

3. Along the southwesterly side of the plaintiff's property is a passway ten feet wide. Some of the defendants own property fronting on Shell Avenue, but not bounded on the beach. By their deeds these defendants have the right "to pass and repass on foot over the private pathway next West of the land of John S. Lane, said private pathway begins at said private road (Shell Ave.) and extends to the Beach." The "private pathway" is the ten foot pathway above referred to. The defendants who own this easement, and the other defendants who claim under them, take the position that the easement carries with it the right to use the sandy beach which is on the plaintiff's property for the purpose of bathing, sun bathing, picnicking and other purposes. This position is untenable. The grant of the easement does not mention the beach on the plaintiff's property. It clearly is the intent of the easement simply to give the right to the defendants to get from Shell Avenue to the waters of the Sound and to use the sandy beach within the limits of the ten foot strip. Accordingly, the defendants have no easement by grant in the plaintiff's beach.

On the defendants' claim that they have acquired the right to use the beach for various purposes by prescription, the evidence is clear that the defendants and those under whom they claim and the latters' predecessors in title have used the sandy beach for bathing, sun bathing and marshmallow roasts whenever they have desired for more than 15 years. This use has been open and continuous. It has failed to ripen into a prescriptive right, however, for at least two reasons.

The first of these reasons is that the evidence does not justify a finding that it has been adverse and under a claim of right. As pointed out above, the defendants now claim that they have

the right by virtue of their ownership of property on Shell Avenue and their right of way to the beach. There is no credible evidence, however, that any of them had such a claim in mind for 15 years or indeed at any time prior to the outbreak of the present controversy. The claim of right is so lacking in merit that it seems incredible that any one could make it seriously and it is much more probable that the defendants and others similarly situated when they walked down their passway simply overflowed onto the plaintiff's sandy beach and used it without thought as to whether they had any right or claimed any right so to do.

The second reason why the defendants have not gained a prescriptive right in the beach is that their use of the beach has not been different in kind from that of the general public. During the same time that the defendants and their predecessors have been using the plaintiff's property, members of the general public have also been coming to the same sandy beach. They have come down the same passway that the defendants have used and they have also approached the plaintiff's property from the easterly side, having reached the beach over Seaside Avenue, which runs to the beach some little distance to the east. Having arrived at the plaintiff's property, members of the general public have sat on his sandy beach and used it in just the same way as the defendants. It is well established that the unorganized general public may not acquire an easement by prescription. *Turner vs. Selectmen of Hebron*, 61 Conn. 175, 187; *Merwin vs. Wheeler*, 41 id. 14. "Where the individual use is in common with that of the public, the individual user must, in order to establish an independent prescriptive right, perform some act to the knowledge of the servient owner clearly indicating his individual claim of right." *Great Hill Lake Co. vs. Caswell*, 126 Conn. 364, 366. None of the defendants here, nor their predecessors, have done any acts which would indicate to the plaintiff or his predecessors that they were making any claim to the use of the beach which was any different in nature from that of the public.

Accordingly, it is concluded that these defendants have no easement in the sandy beach either by grant or by prescription.

4. The "Building Zone Regulations" for the Town of Milford, at section XIIn, provide that: "No building other than a pier or boathouse shall be erected within a distance of twenty feet of the highwater mark along the shore of Long Island

Sound or its tidal inlets." Section Ia, of the same regulations defines the word "building" as including the word "structure." The fences erected by the plaintiff clearly are structures within the meaning of the regulations and, therefore, their erection within 20 feet of high water was in violation of the regulations. This is true even though the plaintiff did obtain from the town plan and building inspector a purported permit to erect the fences, because, if for no other reason, said permit on its face is on condition "that all town ordinances, zoning and building regulations shall be complied with."

The fact that said fences are being maintained in violation of the "Building Zone Regulations" puts the plaintiff so far in the wrong that it prevents the issuance of an injunction restraining the defendants "from tearing down, defacing, destroying or removing the fence" as prayed. It does not, however, justify the issuance on the cross complaint of an injunction directing the removal of the fences, because it cannot be found that the defendants are peculiarly damaged by the maintenance of the fences and the violation of the regulations. They are affected thereby only in the same way and to the same extent as is the general public. *Fitzgerald vs. Merard Holding Co.*, 106 Conn. 475.

Judgment may enter declaring that the plaintiff is the owner in fee of the land described in the complaint and that the southeasterly boundary thereof is the high water mark of Long Island Sound, which at present is a line drawn from a point in the plaintiff's southwesterly boundary eight feet southeasterly from the face of his sea wall to a point in his northeasterly boundary 13½ feet southeasterly of the face of his sea wall, and that the defendants have no rights or easements to use the sandy beach on said property above high water mark, and enjoining the defendants from trespassing on the plaintiff's said property and that the plaintiff recover of the defendants one dollar damages and his taxable costs.