[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action by the plaintiff by way of a substituted complaint alleging four counts of trespass and seeking an injunction against the defendant, Waterfront Park Association (Association), and several of its members to prevent future encroachments on property she claims she owns as well as compensatory and exemplary damages for past encroachments.
The defendants generally dispute the plaintiff's title to and possession of the piece of land in question. Additionally, by way of special defenses, they claim that the Association and its members have acquired rights to enter onto and use the disputed land through adverse possession and prescriptive easement.
On June 1, 1989, the plaintiff purchased a piece of property in Coventry known as 35 Shore Drive, and she has resided in a house on that property since that date. Her house overlooks a portion of Coventry Lake, also known as Lake Wamgumbaug, variously spelled Wangumbaug. The portion of the lake in front of her house is a cove formed by the natural curve of the western end of the lake and a spit of land which projects into the lake from the south shore of the lake. This projection of land is locally known as "the peninsula," this memorandum refers to it by that name.
The plaintiff contends that the eastern and western boundary lines of 35 Shore Drive extend to the high-water line of the lake. This interpretation would result in the high-water line being the northern boundary of the plaintiff's property. These putative property lines would encompass the western two-thirds of the peninsula for its entire length within the plaintiff's property.
Toward the end of May 1990, defendant Belcher, president of the Association, informed the plaintiff that a number of docks would be installed on the peninsula the next day so that she might expect to see workmen at the site. The plaintiff assumed that the docks were to CT Page 141 be installed on the eastern side of the peninsula, to which side the plaintiff makes no claim. Instead, five movable, wooden docks, approximately four feet by twenty feet, were installed on the western side of the peninsula. Each dock can moor two boats, and, by July 1990, up to ten boats were using these docks regularly.
Use of these docks was reserved by the Association for its members who did not own property directly on the lake and had signed up on a list. Each such member was assigned use of a specific side of a dock by the Association.
The plaintiff protested the installation of these docks at informal and formal meetings with association officers and members, by correspondence with the Association through her attorney, and by placing several "no trespassing" signs along the asserted eastern boundary of her property. The signs were promptly removed by unknown parties. Eventually, the plaintiff hired a surveying company who prepared an A-2 survey of the area. (Plaintiff's Exhibit 23.)
The docks were removed for the winter of 1990 to 1991, and four of them were re-installed on the western side of the peninsula in the spring of 1991. The fifth dock was re-installed on the eastern side of the peninsula at the tip. The Association plans to install the docks at the beginning of each boating season and remove them at the end.
The area of the southern shore of the lake, pertinent to this case, was first developed by James H. Fitzgerald in 1919. The parcel which eventually became 35 Shore Drive was first conveyed by Fitzgerald to Alvin V. Nelson by a warrantee deed (Plaintiff's Exhibit 22), dated August 7, 1931, which deed contained the following language:
 ". . . a certain piece or parcel of land situated in the Town of Coventry, County of Tolland and State of Connecticut comprising the easterly half of lot #4, and the westerly half of lot #5 block 2 on a plan known as `Map of Gerald Park and Vicinity, Lake Wangumbaug, South Coventry, Conn. by James H. Fitzgerald, C.E.' on file in the town records of said Town of Coventry, bounded and described as follows: to wit, Commencing at a point in the northerly line of Anger Avenue, said point being distant twenty-five (25) feet westerly from the westerly line of lot #6, as appears on said plan, the line runs thence northerly for a distance of one hundred and sixty (160) feet — more or less, to the shore of Lake Wangumbaug; thence westerly by said shore of said lake Wangumbaug for a distance of fifty (50) feet — more or less; thence southerly by land of the concourse and the CT Page 142 westerly half of lot #4 as appears on said plan, for a distance of one hundred and sixty-five (165) feet — more or less, to the northerly line of said Anger Avenue; thence easterly in the northerly line of said Anger Avenue for a distance of fifty (50) feet — more or less, to the first-mentioned point and place of commencement; together with the right to use in common with others, the bathing beach on the Concourse aforesaid. . . ."
Virtually identical language is repeated in each mesne conveyance and in the deed to the plaintiff. (Plaintiff's Exhibits 1 and 14 to 21.) Anger Avenue has become Shore Drive.
The pertinent portion of the Gerald Park map or plan (Plaintiff's Exhibit 25) referred to above depicts lots 4 and 5 of block 2 to be nearly rectangular in shape and bounded on the northerly side, not by the lake, but by a concourse. This concourse is an approximately twenty-five foot wide strip of land which abuts and runs generally parallel to the shore line shown on the map. An area designated as a bathing beach is located along this concourse a short distance to the east of the parcel in question. The dimensions of lots 4 and 5 are not specified on the map. The map does not display the peninsula which is the locus in quo.
The court finds, however, that this peninsula did exist with substantially the same size and shape in the 1920's and 1930's as it exists today. The issue of the date of creation of the peninsula was a contested one at trial. The court heard testimony from witnesses who recalled that the peninsula was created when the cove was dredged in 1957. However, the court also heard testimony from a witness (Beckwith) whose brother-in-law and whose parents owned the property now known as 35 Shore Drive in the early 1930's and who was familiar with this area in the 1920's. This witness' father built the stone retaining wall depicted in the plaintiff's survey (Plaintiff's Exhibit 23) and in numerous photographs (Plaintiff's Exhibits 2 and 3, and Defendants' Exhibits AA, BB, and CC) in the 1930's. Her testimony was corroborated by other witnesses who vividly recalled using the peninsula for recreation as children during the 1940's and early 1950's, including a witness whose father participated in dredging the cove.
But the strongest support for the continuing existence of the peninsula was three photographs (Defendants' Exhibits AA, BB, and CC), taken around 1938, 1945, and 1950 respectively, as well as an aerial photograph taken in 1955 (Defendants' Exhibit D) in which photographs the peninsula is clearly visible and extant. The 1938 photograph shows the peninsula covered with vegetation indicating to the court that the peninsula had existed, undisturbed, for some time before 1938. CT Page 143
The court also finds credible the testimony of Beckwith relating to her father, Alexis Caisse, Sr., who constructed the first cottage at the 35 Shore Drive property, and stated that he believed that the stone retaining wall he built coincided with his northerly boundary line.
On July 31, 1931, one week before Fitzgerald deeded the locus to Nelson, Fitzgerald conveyed most of the remainder of the development, including the concourse, to Gladys M. Andrews and Stephen Cubles by deed. (Plaintiff's Exhibit 24.) The parcel to be sold to Nelson a week later was carved out of the description of the "Second Piece" in this deed, and, in fact, that description refers to Nelson as if he were already an abutter to the Second Piece. The following language in the description of the Second Piece describes the northerly boundary of that piece:
 ". . . thence northerly on said easterly line of lot #7, for a distance of 135 feet — more or less, to said Concourse; thence westerly along said Concourse for a distance of 125 feet — more or less, to land of Alvin T. [sic] Nelson; thence southerly by the northerly line of said Anger Avenue; thence westerly in the northerly line of said Anger Avenue for a distance of 50 feet — more or less, to the easterly line of the westerly half of lot #4, block 2, as shown on said plan; thence northerly along said easterly line of the western half of lot #4 block 2 for a distance of 160 feet — more or less, to the high-water mark of Lake Wangumbaug; thence westerly by said high-water mark of Lake Wangumbaug for a distance of 287 feet. . . ."
The same deed also conveys a "Third Piece" which is a section of the concourse. This section is described as bounded on the west by the Nelson property and on the north by the lake.
The A-2 survey of this area (Plaintiff's Exhibit 23), which the court finds depicts distances accurately, indicates that the approximate location of the southerly line of the concourse crossed the plaintiff's purported boundary lines about one hundred fifty-five feet north of the northerly line of Shore Drive on the eastern boundary line and one hundred sixty-five feet north of the northerly line of Shore Drive on the western boundary line. Thus, the dimensions of the property repeatedly given in the deeds fairly matches the survey with lots 4 and 5 as depicted on the Gerald Park map if the northern boundary of 35 Shore Drive is assumed to be the concourse and not "the shore" of the lake.
The survey also indicates that the stone retaining wall built by Caisse, and believed by him to lie on his northerly boundary line, is CT Page 144 about one hundred seventy-eight and one-half feet north of the northerly line of Shore Drive, and about twenty-four feet to the north of the southerly line of the concourse. This stone wall nearly coincides with the northerly line of the concourse as it traverses the area between Shore Drive and the lake as depicted on the Gerald Park map. It is clear then that Caisse regarded the property now called 35 Shore Drive as including this section of the concourse.
The survey also indicates that if the eastern and western boundary lines of 35 Shore Drive are extended from Shore Drive, through the concourse, to the present high-water line of the lake, the eastern boundary line, thus extended, measures three hundred forty-five feet, and the western boundary line, thus extended, measures two hundred fourteen feet. Therefore, if the high-water line of the lake is the true northern boundary of 35 Shore Drive, the eastern boundary line of the parcel in reality would be more than double the distance of that boundary line as described in the deeds, viz. one hundred sixty feet.
An attorney specializing in title searches and qualified as an expert in this field, Eban Burns, searched the title of 35 Shore Drive as well as the titles of other lots depicted in the Gerald Park map both to the east and west of 35 Shore Drive. He found that the northern boundary of these other properties was consistently designated as the concourse. The plaintiff's property is the only lot along this stretch which had "the shore at Lake Wamgumbaug" given as the northern bound.
The association was organized and incorporated in 1941. (Defendants' Exhibit E.) In order to qualify as a member of the Association one must either own or rent property within the Waterfront Park development. The Association has owned the land adjacent to the plaintiff's property on the east since 1941. This land comprises a bathing beach, the Association's community park, the Association's driveway lot, a "snack shack" selling refreshments, and a paved which leads from Shore Drive to the beach and peninsula area. A progression of signs has been posted for decades near the driveway entrance close to Shore Drive and the parking area. Each sign so posted indicated and still indicates that the property described above belongs to the association and is for member use only.
Since 1941 the Association's members have regularly used the entire peninsula, in a manner appropriate to the season, for such activities as sunbathing, picknicking, fishing, the burning of bonfires, the launching of Fourth of July fireworks displays, and as the take-off point for swimming, waterskiing, and ice skating. The western side of the peninsula has been and still is a favorite location for members to moor or beach their boats. The western side was favored for this purpose because the water on the eastern side of the peninsula was roped off to create a swimming area for members and CT Page 145 their children. During the 1960's to the 1980's Association members occasionally installed docks on the western side of the peninsula. The presence of these docks was sporadic and their use limited to the members who installed them.
The Association members have always regarded the entire peninsula as part of their beach area and belonging to the Association, and have used the peninsula consistent with this belief. Its members have never sought permission from any owner of 35 Shore Drive to enter upon and use the peninsula. The members believed and believe that they were and are entitled to use the peninsula for recreational purposes by virtue of their membership in the Association and not as members of the general public.
The Association has long had a "beach committee" whose responsibilities included cleaning the beach and peninsula of debris and trimming overgrown vegetation. These clean-up activities are usually executed on an annual basis. Also, before the Town of Coventry had its own police department, the Association hired a constable to monitor this area. Part of the constable's duties included insuring that only members or their guests were using the property.
Previous residents of 35 Shore Drive, viz. Richard Barry, who resided there from 1968 to 1985, and the Caisse family, who owned the property from 1931 to 1967, never regarded the peninsula as a part of the 35 Shore Drive property. These residents occasionally used the peninsula but as members of the Association and not under a claim of individual ownership.
Persons who were not members of the Association have sometimes used the peninsula also, but these occasions appear to the court to have been infrequent. The Association's membership regarded such non-member presence as unauthorized and intrusive and took steps to discourage it.
 I
"An action in trespass is an action for damages by the possessor of the land." (Emphasis added.) Connecticut Law of Torts, Section 17, p. 20. Title is only incidentally relevant to the possessory action of trespass. Staff v. Hawkins, 135 Conn. 316, 317 (1949).
Where a plaintiff claiming trespass seeks both damages and an injunctive, title becomes an essential, additional element of the plaintiff's case. Velsmid v. Nelson, 175 Conn. 221, 224 (1978); Wadsworth Realty Co. v. Sundberg, 165 Conn. 457, 461 (1973); LaFreniere v. Gallinas, 148 Conn. 660, 665 (1961); and Barrs v. Zukowski, 148 Conn. 158, 164 (1961).
Because trespass is a possessory action, it is incumbent on the CT Page 146 plaintiff to prove possession of the locus in order to recover. Wadsworth Realty Co. v. Sundberg, supra; More v. Urbano, 151 Conn. 381,383 (1964); and LaFreniere v. Gallinas, supra. Proof of title does not automatically prove possession sufficient to establish a right to recover for alleged trespasses. Toby v. Reed, 9 Conn. 216,223 (1823). But, possession may be either actual or constructive. Wadsworth Realty Co. v. Sundberg, supra; More v. Urbano, supra; and Avery v. Spicer, 90 Conn. 576, 579 (1916).
Actual possession, in the context of a trespass complaint, means actual and exclusive possession of the locus by the plaintiff at the time of the alleged encroachment. Avery v. Spicer, supra, 582; and Radican v. Hughes, 86 Conn. 536, 545 (1913). Where, at the time of the alleged intrusion, a party other than the plaintiff is also maintaining, occupying, or using the locus, the plaintiff cannot be said to be in exclusive and, therefore, actual possession. Ibid.
In the instant case, the Association, through the actions of its members, has used, maintained, and occupied the peninsula in the various manners stated above and continues to do so. There was ample evidence presented to demonstrate that the Association members believed and still believe that the peninsula is part of their beach property. Previous residents of 35 Shore Drive concurred in this belief over a substantial period of time. Neither the Association nor its members have ever asked permission of the owners of 35 Shore Drive to engage in the activities noted above. The plaintiff's activities relating to the peninsula have been limited to walking along its length, posting signs as mentioned above, and protesting the Association's occupation and use of the western two-thirds of the peninsula. These protests were rejected by the Association, and the members continue to use the peninsula as before.
Simple re-entry onto the locus does not revert the title holder with possession. Payne v. Clark, 20 Conn. 30, 35 (1849); nor does formal or informal protestation. Radican v. Hughes, supra. Under these circumstances the court finds that the plaintiff has not proved by a preponderance of the evidence that she was and is in actual, exclusive possession of the peninsula.
Because the plaintiff has failed to prove actual possession, in order to succeed in her claims of trespass, the plaintiff must prove she was in constructive possession. Gura v. Scotnickie, 102 Conn. 83,92 (1925); and Connecticut Light Power Co. v. Fleetwood, 124 Conn. 386,390 (1938). In order to prove constructive possession the plaintiff must prove two things. First, she must prove title to the peninsula, and, second, she must prove the absence of actual, exclusive possession by another. Wadsworth Realty Co. v. Sundberg, supra; Connecticut Light Power Co. v. Fleetwood, supra; Gura v. Scotnickie, supra; and Radican v. Hughes, supra. CT Page 147
 II
The issue of title to the peninsula was vigorously contested at trial. One point of agreement, however, was that the description of the premises conveyed to the plaintiff and her predecessors in title contains conflicting terms and ambiguities. Ambiguities in a deed description can be patent ones, i.e., ambiguities which are apparent on the face of the deed, F. AK, Inc. v. Sleeper, 161 Conn. 505, 510
(1971); or they can be latent ones, i.e., ambiguities disclosed by parol or extrinsic evidence. Ibid, p. 511. The deed description in this case contains both.
Where a deed description is unclear or ambiguous, the intention of the parties is the decisive question of fact. Ibid, p. 510. The court must seek to discover the intent of the parties to the deed by permitting the introduction of evidence of the situation of the property and the surrounding circumstances at the time of the conveyance and then look at the terms of the deed in their light. Ibid., p. 511; Lake Garda Improvement Assn. v. Battistoni, 160 Conn. 503,513 (1971).
In the present case the deed description makes reference to the Gerald Park map. It states that the parcel in question comprises the easterly half of lot #4 and the westerly half of lot #5 of block 2 on the map. The northerly boundary of these lots is the southerly line of the concourse. When a deed indicates that a map is incorporated by reference, the map itself becomes a part of the description in the deed. Powell on Real Property, Section 899[3], (1991 Revision); Lake Garda Improvement Assn., v. Battistoni, supra, 511; and Stankiewicz v. Miami Beach Assn., Inc., 191 Conn. 165, 171 (1983).
The calls in the deed, however, do not state that the northerly boundary of the parcel is the southerly line of the concourse. Instead, that call describes the northerly boundary as "the shore at Lake Wamgumbaug." Also, the concourse is listed as one of the western abutters of the parcel. This implies that the westerly boundary of the parcel passes through the concourse rather than terminating at the southerly line of the concourse. The call for the easterly boundary of the parcel fails to mention the concourse at all. If that easterly boundary passed through the concourse, that call ought to have listed the concourse as an abutter, but only lot #6 is listed as such.
The result is that description by calls conflicts with the map, and the calls for the easterly and westerly boundaries conflict with each other. These conflicts produce patent ambiguities.
There are also latent ambiguities concerning the location of the northerly boundary. The deed description indicates that the lengths of the easterly and westerly boundaries are one hundred sixty feet and one hundred sixty-five feet respectively. The A-2 survey, as CT Page 148 interpreted by a representative, Geissler, of its preparer, testified that if these distances are measured out on the ground, the northern end of the parcel would be the southerly line of the concourse. This result corresponds with the dimensions of the parcel as given by the Gerald Park map, which dimensions exclude the concourse.
According to Geissler, the lengths of the easterly and westerly boundaries of the parcel including the concourse would be one hundred seventy-eight and one-half feet approximately. The court has found both the A-2 survey and the expert testimony of Geissler, with respect to this issue, credible and accurate. The court may rely upon the opinions of experts to resolve issues of this kind. Feuer v. Henderson, 181 Conn. 454, 458 (1980).
The plaintiff argues that the court ought to resolve these ambiguities by finding that the intent of Fitzgerald was to convey not only the sum of one-half of lot #4 and one-half of lot #5 but also that section of the concourse which abutted those parts. The defendants urge the court to find that the concourse was not part of the conveyance. The court finds that the evidence, when viewed with the aid of certain rules of construction, supports the plaintiff's position on this issue.
Where the distances given in a deed conflict with other terms of the description certain rules of construction have evolved into hierarchy of calls to assist the trier-of-fact in determining the grantor's intent. One of the rules is that a particular description predominates over a general one. Powell on Real Property, Section 899[3][b]. Another rule is that monuments prevail over distances. Velsmid v. Nelson, supra, 227; Frank Towers Corporation v. Laviana,140 Conn. 45, 50 (1953); and Powell on Real Property, Section 899[3][c].
In this case, if Fitzgerald meant to convey only up to the concourse, the terminus of the easterly call would have been the concourse and not the shore of the lake; the northerly call would then have listed the concourse as the sole abutter and not the shore of the lake; and the westerly call would not have mentioned the concourse as an abutter at all. The court finds that it is much more likely that the distances were incorrectly estimated or transcribed. The specific reference to the concourse as a westerly abutter is highly probative on this issue.
It may be argued that while the distances alone might be insufficient to disclose the grantor's intent, these distances in combination with the Gerald Park map ought to persuade the court to adopt the defendants' position. In some cases a description by reference to a map may control over a description by fixed boundaries, but this would be only in those cases "where a portion of the land enclosed within the fixed boundary would be shown on the map to be included in a lot other than the lot conveyed to the party who was CT Page 149 relying on the fixed boundary." (Emphasis added.) Raffel v. Brodman,8 Conn. Sup. 247, 250 (1940). Here, the fixed boundary description does not purport to convey land which is part of another lot in the Gerald Park map, but rather land which is designated as part of a concourse.
Another rule of construction which supports the plaintiff's position is that ambiguous language in a grant is ordinarily construed against the grantor and in favor of the grantee. Lake Garda Improvement Assn. v. Battistoni, supra, 514, 515; and Powell on Real Property, Section 899[3][a].
In addition to rules of construction there are other factors which support the plaintiff's contention. In order to resolve an ambiguity of this sort the court must seek to discover the intent of the parties to the deeds by considering evidence of the situation of the property and the surrounding circumstances in their light. F. 
AK, Inc. v. Sleeper, supra, 511; and Lake Garda Improvement Assn. v. Battistoni, supra, 513.
As mentioned above, one week before the conveyance in question Fitzgerald deeded most of the remaining portion of the development, including the concourse, to Andrews and Cubles. This earlier conveyance did not convey that section of the concourse which the plaintiff claims is hers but did convey those sections of it to the east and west of the claimed section. This deed specifically lists the plaintiff's predecessor in title as the westerly abutter to that section of the concourse which was conveyed. This description demonstrates and confirms that Fitzgerald did intend to convey a section of the concourse to the plaintiff's predecessor in title.
Additionally, the Caisse family, whose ownership of the parcel in question resulted in the first cottage to be constructed on the site, regarded their land as extending from what is now Shore Drive to the northerly and not southerly line of the concourse. Alexis Caisse built a stone retaining wall on this line. "An owner is presumed in law to have knowledge of the boundaries of his own land." Connecticut Light 
Power Co. v. Fleetwood, supra. The erection of a stone wall along this line by the plaintiff's predecessor in title is good evidence as to the true boundary. Apostles of the Sacred Heart v. Curott, 187 Conn. 591,594 (1982).
For the reasons stated above the court concludes that Fitzgerald intended to convey to the plaintiff's predecessor in title the eastern half of lot #4, the western half of lot #5, and also that section of the concourse which abutted these half-lots on the north.
The next ambiguity to be addressed by the court concerns the meaning of the phrase "the shore of Lake Wamgumbaug" as used in the deeds in the plaintiff's chain of title. The Gerald Park map depicts the northerly line of the concourse as a gently waving line roughly CT Page 150 parallelling its southerly line in vicinity of lots 4 and 5 of block 2. Four additional gently waving lines parallel to each other and to the northerly line of the concourse also appear on the map. These additional lines lie generally to the north of the concourse. The significance of these four lines is not indicated on the portion of the map which constitutes plaintiff's Exhibit 25. The peninsula is not depicted on the map. The court has found, however, that the peninsula did exist, in substantially the same size and shape as at present, at the time the map was filed.
Also, the description in the deeds under consideration delineates an easterly boundary of one hundred sixty feet and a westerly boundary of one hundred sixty-five feet, more or less. The A-2 survey indicates, and the court has found, that the northerly line of the concourse at this location was about one hundred seventy-eight and one-half feet north of Shore Drive at both its easterly and westerly boundaries. The survey also shows that the present high-water line of the lake is about thirty-five feet farther north on the westerly side and about one hundred sixty-seven feet farther north on the easterly or peninsula side. The court has found that these distances are credible and accurate and existed essentially unchanged at the time Fitzgerald first deeded the property to the plaintiff's predecessor in title.
The plaintiff contends that the phrase "the shore of Lake Wamgumbaug" is equivalent to the high-water line of the lake. The plaintiff's expert witness, Burns, testified that this was his opinion. Usually the word "shore" refers to the land "between ordinary high and low-water mark, the land over which the daily tides ebb and flow." Mihalczo v. Woodmont, 175 Conn. 535, 539 (1978). Also, there is a presumption that an owner who conveys land does not intend to retain a narrow strip of land between that sold and the boundary of his property. Lake Garda Improvement Assn. v. Battistoni, supra, at 514.
The defendants, on the other hand, contend that the disparity between the length given in the deed description of the easterly boundary, viz. one hundred sixty feet, and the actual length if the high-water line is the terminus of that boundary, viz. three hundred forty-two and one-half feet, is so great as to refute any presumption equating "shore" with high-water line. The court agrees with the defendants' position on this issue.
In the Lake Garda Improvement Assn. case, supra, the Connecticut Supreme Court faced a latent ambiguity somewhat similar to the one present in the instant case. There the issue was whether a deed transferring property described as "Beach Road" included only the paved portion of the road as it was displayed on a map incorporated into the deed by reference. A beach area adjacent to the roadway was missing from the map. Our Supreme Court held that the conveyance included the beach area citing the principles which find the retention CT Page 151 of narrow strips of land repugnant and which construes a deed against its drafter. But that Court also stated that words in a deed are to be given their "ordinary popular meaning, unless their context, or the circumstances show that a special meaning was intended." p. 511. The Court further noted that in resolving such issues the trial court "may also consider the surrounding circumstances at the time of the conveyance, and the situation of the parties at that time." p. 513.
In the case subjudice the court finds that the phrase "shore of Lake Wamgumbaug" was not intended by Fitzgerald to convey to the high-water line but only to a line on the bank of the lake. This line coincides with the stone retaining wall built by Alexis Caisse. Again, the Caisse family believed this wall to be on their property line. Another predecessor in title of the plaintiff, Richard Barry, while believing his property extended to the water line on the westerly boundary, did not believe his land included the peninsula on the easterly side. As noted above, the opinion of the predecessor in title as to his property lines is relevant evidence of where these lines lie.
Also, in the deed from Fitzgerald to Andrews and Cubles, written one week before the conveyance to the plaintiff's predecessor in title, involving much of the land surrounding the locus in question and the concourse, Fitzgerald used the phrases "high-water mark" or "water line of Lake Wangumbaug" at least three times. The word "shore" is never employed. This demonstrates to the court that Fitzgerald was familiar with the terms "high-water mark" and "water line," and supports the position that Fitzgerald's use of the word "shore" was intended to mean something besides the high-water line.
Finally, the disparity in length between one hundred sixty feet and three hundred forty-two and one-half feet strikes the court as not falling within reasonable range of values permitted by the phrase "more or less." The distance from Shore Drive to the tip of the peninsula is more than double that given in the deed. This disparity supports the inference that the words "to the shore" were not intended to mean to the water-line of the lake.
In cases of trespass claims, the plaintiff is obliged to locate the boundary line. LaFreniere v. Gallinas, supra; and Barrs v. Zukowski, supra. For the above reasons the court concludes that the plaintiff has not met this burden by a preponderance of the evidence.
 III
As to the second prong required to establish constructive possession, i.e., the absence of exclusive possession in another, the court feels that the plaintiff has failed to meet her burden by a preponderance of the evidence also. CT Page 152
The long history of occupation and use of the peninsula by Association members has been recited above. This occupation and use has been open, visible, and made under a claim of right. The Association has taken measures to insure that use of the beach area, including the peninsula, was restricted to Association members. It has posted signs warning the public that this recreational area is not open to the public. The succession of signs was posted near the only right-of-way from the public highway to the beach and peninsula area. The Association members have asked non-members discovered using the area to leave. The Association hired a constable to patrol this general area. At one point the Association experimented with the issuance of membership stickers to be affixed to members' vehicles so as to more easily spot possible unauthorized use. Neither the Association nor its member ever sought permission from the owners of 35 Shore Drive to use the peninsula.
It is true that on occasion non-members have used the peninsula and beach area, but the court has found non-member use to be rare and not sanctioned by the Association or its members. Such limited and infrequent public use does not negate the strong evidence of exclusive Association possession demonstrated here. Saunders Point Assn., Inc. v. Cannon, 177 Conn. 413, 418 (1979).
For these reasons the court holds that the plaintiff has not proven the counts in her complaint.
 IV
As an alternative basis for this decision, even if the court assumes that the plaintiff had actual or constructive possession of the peninsula, the court also finds that the defendants have proven their Second Special Defense which asserts that the Association has acquired a prescriptive easement to engage in those activities alleged in the complaint, including the installation and use of movable, wooden docks on the west side of the peninsula.
With respect to a claim of prescriptive easement, the claimant must demonstrate that the use was open, visible, adverse, continuous, and uninterrupted for fifteen years and made under a claim of right. Wadsworth Realty Co. v. Sundberg, supra, 463. The burden of proof is by a fair preponderance of the evidence. Schulz v. Syvertsen,219 Conn. 81, 91 (1991).
The court finds that the defendants have proven that the Association directly and through its members had used the peninsula area for recreational purposes, appropriate to the season and its location on Coventry Lake, since the Association came into being in 1941. This use was continuous and uninterrupted to the present despite the plaintiff's recent efforts to persuade the Association to relinquish use of it. CT Page 153
This use was under a claim of right. The Association members regarded this right to enjoy the recreational benefits of the peninsula as arising rom the Association's possession and ownership of the peninsula. The Association and its member have always seen the peninsula as being an extension of the Association's beach which lies to the south and east of the peninsula. Again, the Association members never consulted nor sought permission from the owners of 35 Shore Drive concerning use of the peninsula.
The open nature of this usage and its exclusivity have been amply discussed above, and the court's findings therein are incorporated into this section of the Memorandum. Having reached these findings, the fact pattern in this case strongly resembles that of Saunders Point Assn., Inc. v. Cannon, supra. That decision upheld the trial court's determination that a prescriptive easement for the recreational use of a beach along the Niantic River had been established by a beach club.
An additional issue presents itself in the instant case, however. Previous to 1989 the use of docks on the westerly side of the peninsula was limited to the installation of one or two docks by individual Association members for their individual use. In May of 1990 the Association installed five wooden, movable docks in this location and allowed members to reserve use of a particular dock for the boating season. This was done to provide dock space for members who did not own or rent property which fronted the lake.
The plaintiff asserts that, if docks were ever placed at this location in the past, the new dock usage unreasonably expands the kind of activity to which the western side of the peninsula is put. Any past docking enterprise was not as large nor done on a yearly basis. The court finds that the number of boats using the western side of the peninsula for mooring appears relatively constant since 1941. The installation at the new docks does facilitate the mooring of boats of a larger size. Before the docks were installed, boats were typically secured to the land by staking, anchoring, or by the beaching of the boats.
Unlike an easement created by grant, an easement by prescription is limited in nature. Lichteig v. Churinetz, 9 Conn. App. 406, 410
(1986). When an easement is established by prescription, "the common and ordinary use which establishes the right also limits and qualifies it." Hawley v. McCabe, 117 Conn. 558, 560 (1933).
The court has found that the westerly side of the peninsula has consistently been used to moor boats during the boating season. The court has also found that the Association and its members have acquired an easement to continue to do so by prescription. The question becomes whether the annual use of movable, wooden docks CT Page 154 extends beyond the user which has been acquired. The court holds that such use falls within the reasonable use of the peninsula acquired by prescriptive easement.
In the case of Kuras v. Kope, 205 Conn. 332 (1987), the Connecticut Supreme Court faced the issue of whether a dirt path, acquired by prescriptive easement as a right-of-way, could lawfully be graded, paved, repaired, and have a new bridge constructed over a stream which was not bridged at that location previously. The trial court held that the owner of the easement could fill in potholes but not alter the dirt path in any other manner. Our Supreme Court reversed and remanded the case stating at page 342 that the owner of prescriptive easement may "do whatever is reasonably necessary to make it suitable and convenient for his use." That Court noted that the original use does not "fix the scope of the easement eternally." Ibid.
The test set forth in the Kuras case is whether the desired acts are reasonably necessary to make effective the easement owner's enjoyment of that easement unless the burden on the servient estate is thereby increased. Ibid., p. 344.
In the present case the court has found that the number of boats using the westerly side of the peninsula will not increase by the installation of the docks by the Association. In fact, the use of that site may be more orderly and stabilized by the assignment of particular docking space to specific members. The fact that potentially larger craft may use the peninsula would not seem to burden 35 Shore Drive. No use of 35 Shore Drive suffers a greater impingement by the use of the docks, as opposed to a possible increase in annoyance to the plaintiff, over that caused by watercraft anchoring or staking in the identical location. In other words, while the plaintiff's view may be somewhat altered by the presence of the docks, these docks create no added burden to the servient property, i.e., the peninsula and 35 Shore Drive.
The court finds that the installation of the docks by the Association is an "evolutionary but not revolutionary" change, Ibid., p. 343, which does not increase the burden on the plaintiff's property, assuming arguendo that she possesses the peninsula. The court further finds that the defendants have proven by a fair preponderance of the evidence that the Association and its members have acquired a prescriptive easement to use the peninsula for the recreational purposes stated above.
As an alternative holding, the court holds that the area to which this easement applies is the westerly two-thirds of the peninsula, more particularly described as follows:
Beginning at a point which is the intersection of the line depicting the westerly boundary of 35 Shore Drive on Plaintiff's CT Page 155 Exhibit 23 and the present high-water line of Coventry Lake as depicted on said Exhibit; thence easterly from said point fifty (50) feet, more or less, along a line parallel to that formed by the northerly line of Shore Drive to a point which is the intersection of this parallel line and the line depicting the purported easterly boundary of 35 Shore Drive on said Exhibit; thence northerly along said last-mentioned line for a distance of one hundred thirty-two (132) feet, more or less, to the present high-water line of the lake at the northern tip of the peninsula; thence, westerly and southerly along the present high-water line of the lake to the point of beginning.
In conclusion, the court holds that the plaintiff has not met her burden of proving actual, exclusive possession of the western two-thirds of the peninsula in herself by a fair preponderance of the evidence, has not met her burden of proving title to this area by a fair preponderance of the evidence; and, has not met her burden of proving the absence of actual, exclusive possession in another by that standard. As an alternative holding, the court holds that the defendants have proven by a fair preponderance of the evidence that the Association and its members have acquired a prescriptive easement to engage in the activities stated above.
Therefore, the court finds for the defendants on all counts of the complaint.
Sferrazza, J.