[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
NATURE OF PROCEEDINGS
By petitions filed 10/16/92, the Department of Children and Youth Services (hereinafter DCYS; renamed Department of Children and Families, or DCF subsequent to initiation of this action) seeks to terminate the parental rights of Patsy W. in her children Tabitha P., born 1/30/84, and Damion P., born 4/25/86 so that, after spending most of their lives in the care of others, they could be free for permanent placement in adoption or, alternatively, in permanent foster care. Parental rights of the respective putative fathers of each child had been terminated in a prior proceeding in this court on 2/27/91. Patsy's parental rights in two older children, born in 1980 and 1982, were also previously terminated with her consent and are not involved in the present action.
At the initial hearing on 11/24/92, Patsy appeared with counsel, having been personally served, and pro forma denials were entered as to both of the pleaded grounds for terminating her parental rights: Failure to rehabilitate, and denial of necessary care by reason of parental acts of commission or omission, pursuant to subsection (b) of Section 17a-112 of the Conn. Gen. Stats. (Rev. 1991) applicable to children such as these who were previously committed to DCYS as neglected or uncared for. Psychological evaluations were ordered in a court hearing on 12/2/92, although appointments were not arranged with the evaluator until February of 1993. At a case status conference on 3/10/93, following receipt of that evaluation, trial was scheduled for three dates certain in September of 1993, later extended into early October of 1993. For reasons which do not appear of record, no trial was conducted in 1993, and at a judicial pretrial conducted on 11/17/93, a second trial date certain was set for three days beginning in January of 1994, with updates to the psychological evaluations previously conducted ordered to be received a month before trial.
Evidence was offered in five days of trial beginning January 14 and ending on March 7, 1994. The parties were given until 4/25/94 for the submission of trial memoranda, later extended to CT Page 8451 5/4/94 at the request of counsel.
At the judicial pretrial on 11/17/93, the court set 12/10/93 as the final date for the petitioner to update her pleadings and social history as well as for the exchange of lists of witnesses and documentary evidence. On 12/17/93, all pretrial motions pending on that date were acted upon, withdrawn or marked off. Subsequently, on 12/22/93, the court received a "Motion to Amend Petitions for Termination of Parental Rights" which was denied on the second trial date (1/28/94) as not having been timely filed.
APPLICABLE DATES:
The adjudicatory date for both petitions is therefore 10/24/92, the date they were originally filed in the absence of any timely filed amendment. (Practice Book Sec. 1042.1(4); In ReRomance M., 205 Conn. 345 (1994).) The dispositional date is 3/7/94, the last date for the taking of evidence. The period of reserved decision commences on 5/4/94, the date requested by counsel for the filing of trial memoranda.
FACTS
Evidence offered in five trial days, interpreted in the light of the nearly seven year history involving Patsy and these two children in this court, supports the following findings:
1. Prior to the first petition filed in this court:
Patsy's parents were divorced when she was four years old, and Patsy remained with her abusive mother until she was 14 when she was first placed in foster care and later into a group home. She was sent to live with her father in Texas but returned in a few months after conflicts arose with him. In the remaining years of her minority, Patsy lived off and on with her mother, in various other licensed placements (group homes; residential treatment centers) and in temporary unlicensed situations until the birth of her first out of wedlock child in November of 1980 when she was 18 years old. Despite the assistance of various professional agencies, Patsy experienced difficulties caring for the baby and agreed to place him in foster care when he was one month old. The following spring Patsy acknowledged that she was unable to provide him with adequate care and consented to the termination of her parental rights so that he could be placed in adoption. Termination was ordered in this court on 7/7/81. Seven months CT Page 8452 later Patsy gave birth to her second son. Again she requested foster care for him and, after more unsuccessful attempts to assist her in providing a home for this child, she again consented to the termination of her parental rights which was ordered [not in this court] the month following the birth of her third out of wedlock child, Tabitha, on 1/30/84.
Because of Patsy's long history of instability, with frequent changes in housing and relationships over a period of nearly 10 years, mother and daughter were referred to DCYS for protective services soon after Tabitha's birth. When the baby was three months old, she and her mother moved out of state and the case presumably was closed. A year later, DCYS's counterpart in Pennsylvania referred the family to DCYS, following Patsy's return to Connecticut, because of concerns in the Pennsylvania agency about her ability to care for the baby. DCYS investigated, found Tabitha receiving adequate care at the time, and did not open a case. Damion was born the following year (4/25/86) and before he was 10 months old DCYS received a referral when he was admitted to the hospital with a broken leg of unknown origin. Patsy gave her permission to place both children in February of 1987, expressing her desire for Damion to be placed with her sister, Mavis.
2. First neglect petition: Filed 3/16/87.
On 3/16/87 DCYS filed petitions alleging both children to be neglected and uncared for. At the initial hearing counsel was appointed to represent the mother and in a hearing on 5/20/87, attended by Patsy's attorney but not by the mother herself, the court found both children to be uncared-for (homeless), making no finding on the allegations of neglect, and transferred their custody and guardianship (legal equivalents of commitment under Subsection (d) of Sec. 46b-129) to the maternal Aunt Mavis, having found her to be a ". . . person . . . suitable and worthy of such responsibility." Under the statute, such ". . . individual shall be the guardian of such child or youth until he has reached the age of eighteen years" unless there is further action of the court under subsection (g) of Sec. 46b-129. In the mother's absence, the court entered these findings and orders without prejudice to Patsy to seek a reopening and further hearing within four weeks. In the absence of any such request to reopen, these orders were regarded as being in effect indefinitely, and no appeal therefrom was taken.
Ten days later, on 6/1/87, Patsy married Gary W., father of CT Page 8453 none of her children. Patsy later characterized him as alcoholic and abusive, and they separated in May of 1988 after both were arrested for assault. At the same time, (5/9/88) Patsy filed petitions seeking to revoke the order of custody to her sister. She did not, however, allege that the "cause for commitment no longer exits", the predicate for ordering revocation under subsection (g) of Sec. 46b-129, but rather alleging that it was ". . . untrue that my children were neglected and uncared for. Also I was not resposible [sic] for my son Damion's broken leg". Although Patsy had visited infrequently initially, in February of 1989 she had begun regular visitation and a week after filing her revocation petition, Aunt Mavis had returned both children to her full-time care where they appeared to be doing well. At the initial hearing on her revocation petition on 6/8/88, a psychological evaluation was ordered at the request of DCYS and the matter continued with the children remaining with Patsy. The first evaluation, conducted by clinical psychologist David Mantell, was received by the court on 8/8/88 and his recommendations followed in a hearing the following day. On 8/9/88, this court revoked the order of guardianship to Aunt Mavis, thus restoring custody and guardianship to Patsy. By this time, Patsy had resumed living with Tabitha's putative father, Robert V. On Dr. Mantell's recommendation, the court ordered Protective Supervision for one year. In so doing, the court apparently regarded Patsy's motion for revocation as one for reopening the original disposition (transfer of custody and guardianship to the aunt) and entering a new dispositional order of Protective Supervision, based upon the original adjudication of uncared-for (homeless) which had been found on 5/29/87, as provided for in subsection of Sec. 17a-93.
3. Second Neglect Petition: Filed 7/28/89.
Two weeks before expiration of the year of Protective Supervision, on 7/25/89, Patsy asked Aunt Mavis to take back the children, having a number of personal and financial problems at the time. When Aunt Mavis found herself unable to control them, she asked DCYS to place them in foster care. DCYS secured an Order of Temporary Custody on 7/28/89, filing new petitions alleging incidents of abuse and neglect which had occurred within the preceding year. The petitioner did not allude to the fact that a prior adjudication of uncared-for (homeless) was still outstanding as the basis for the order of Protective Supervision. Since the petitioner could have filed another motion to reopen the second disposition, asking this time for commitment, but chose to CT Page 8454 file a new petition instead, this court will regard the filing of the second neglect petition as being a tacit request to dismiss the first petition without prejudice to the processing of the second.
At the initial hearing on 8/1/89, both Patsy and Tabitha's father waived hearing on the Order of Temporary Custody, and the same attorney who had represented the mother since May or 1987 was reappointed. An update of Dr. Mantell's evaluation was ordered, and after five sessions with the children, their mother, their two foster mothers, and various combinations of these persons, Dr. Mantell submitted his evaluation and recommendations on 10/4/89:
 It is recommended that the children be committed to the State of Connecticut and that the State strongly considers termination of parental rights.
 It is recommended that the mother not be allowed visitation with the children since the examiner sees little hope that she will be able to rehabilitate and to provide to these children a psychologically safe and nurturant environment that is capable of offering them minimally acceptable psychosocial standards for their growth. The consequence of not terminating parental rights will be two psychologically maladjusted and behaviorally disordered children who will be incapable of taking their place in society. If the circumstances surrounding the children are not changed and permanently now, they are likely to be lost forever.
(State's Ex. 1, pp. 6-7.)
4. First Termination Petition: Filed 11/14/89.
Following receipt of Dr. Mantell's recommendations, DCYS filed petitions on 11/14/89 seeking to terminate the parental rights of the children's parents. At the initial hearing, the mother's attorney appeared and entered pro forma denials on her behalf. On 1/3/90, Patsy appeared with counsel and denied the allegations of both the second neglect petition and the first termination CT Page 8455 petition, but five months later, on 6/19/90, with the advice of counsel, she admitted the allegations of the neglect petition and agreed that the children could be committed to DCYS pursuant to the provisions of subsection (d) of Sec. 46b-129. The court also found grounds to terminate the parental rights of Patsy and both putative fathers, although the record does not disclose if the finding as to Patsy was by her admission or after an evidentiary hearing. The court did note that the grounds for termination reflected conditions obtaining since the original adjudication of uncared-for on 5/20/87 rather than on the date of filing the allegations of neglect to which the mother had just entered admissions.
Notwithstanding Dr. Mantell's clear recommendations, the petitioner and the mother executed a service agreement on 6/19/90 which provided for ongoing contact between mother and both children. This was adopted as the court's expectations leading to reunification in a hearing on 7/31/90 at which grounds were also found to terminate the parental rights of both fathers. Disposition in the termination cases was deferred, however, and yet another psychological evaluation was ordered to be conducted in October of 1990.
On 2/27/91, the court ordered termination of the parental rights of both fathers, but, with the agreement of DCYS, dismissed the termination petitions with regard to Patsy, leaving the children committed to the state under the commitment order of 6/19/90. A month later, on 3/25/91, Tabitha was returned to her mother with the assistance of an intensive Family Preservation Program of Child and Family Agency in place.
In its first Status Report to the court filed 4/30/91, the DCYS social worker reported:
 At this time mother is admitting that having Tabitha home full-time is hard. Tabitha has had three bouts of head lice which have interfered with her going to school regularly. Mother currently has a new boyfriend and there are concerns about mother's being able to stay focused in making Tabitha her main priority.
(State's Ex. 10, p. 2.) CT Page 8456
Six weeks after reporting these concerns to the court, DCYS on 6/18/91, filed a petition to revoke Tabitha's commitment, alleging "the conditions that existed at the time of commitment no longer exist". Without first withdrawing this revocation petition, DCYS, on 7/8/91, filed a motion to reopen the judgment of 6/19/90, revoking the commitment to DCYS and substituting another order of Protective Supervision. The next day this was granted by agreement and the mother restored to custody and guardianship under a second period of court-ordered Protective Supervision, this one to last for the next six months.
Numerous reports of inadequate care of Tabitha were made to DCYS in the months following: Violent episodes between Patsy and her then "fiance", Jeffrey S., that were repeatedly witnessed by Tabitha; the termination of services by the Parent Aid (on 11/15/91) and Child and Family Agency (on 12/6/91) because of lack of cooperation. At an in-court review on 12/10/91, however, the state did not seek another reopening of disposition in order to again seek commitment, but rather agreed to the extension of the period of Protective Supervision for an additional six months, with the added expectation that Patsy should exclude from her household any resident male without prior approval of DCYS. Patsy and her attorney signed their agreement with this expectation (State's Ex. 28) but in fact, as the court learned later, Jeffrey S. continued to live with Patsy and her daughter until some time in January. (State's Ex. 4, p. 105.)
Eight weeks later DCYS did file a motion to again reopen that judgment, seeking reinstatement of Tabitha's commitment. On 2/24/92, following an evidentiary hearing (transcript of which is State's Ex. 4) the court granted that petition, modifying its disposition of 7/9/91 to end the period of Protective Supervision and enter a new order of commitment for a period of 18 months from the date of hearing. After hearing testimony of the state and of the mother, the court made the following findings:
 . . . Patsy W. has had one abusive relationship after another, one with Mr. W., one with Mr. V., who sexually abused the child, and apparently there was an abusive relationship with J. who was a convicted felon and an abusive relationship with Mr. S. . . . Service agreements were put into effect, counselling was offered, parenting classes, parent aides, Head Start, and Mother back CT Page 8457 then terminated the services or did not make full use of them or very haphazardly, and haphazardly would be kind reading through the file . . . and one by one these service providers were terminated.
(State's Ex 4, p. 103.)
The court found inconsistent parenting, crisis intervention that produced compliance by the mother "a little bit of the time and then doesn't" as well as a "continued lack of judgment in choice of males which she has apparently not learned from." (Id., p. 105. Mother was found to have ". . . not been totally credible as a witness and has played fast and loose with the Court's orders." (Id.)
After Tabitha's return to foster care on 2/24/92, she began to disclose episodes of maternal maltreatment that had not earlier been known by DCYS: She had been punished by being forced to kneel on rice, by being repeatedly spanked, by being made to stay home from a school field trip. (State's Ex. 25, pp. 13 -14.) Despite the court's expectation of at least one full day a week visitation (State's Ex. 4, p. 106), Patsy, in fact, missed five out of the first nine scheduled visits with Tabitha after recommitment. (Id.) On one visit, Patsy told her daughter that if she were ever adopted, her mother would kill herself. (Id., p. 14, 15.) In the eight months between Tabitha's recommitment and the filing of these petitions, visitation continued to be sporadic, with mother cancelling for a variety of reasons (State's Ex. 25, pp. 14-20). Patsy was referred repeatedly to a residential program in Norwich which was designed to meet her treatment needs at the time, but she declined. (Id., p. 20-21.) On 9/3/92 Patsy stated her intention of moving in with a married man whose wife was hospitalized in Massachusetts, an Edward R. whom she referred to as "Cowboy", maintaining that they were "just friends". (Ex. 26, p. 3.). She remained living in this situation until the conclusion of this trial, the longest residence she has maintained since becoming known to the state in 1987. Patsy failed to attend any meeting scheduled with the Family Service Parent Education and Support Group, both before and after the commitment hearing on 2/24/92, without apparently valid excuses. (Ex. 25, p. 21.) She discontinued an educational and job training program (OIC) which had been a requirement for her receiving AFDC while Tabitha lived with her as soon as Tabitha was placed and she was discontinued on AFDC. (Id., p. 22.) Her Child and Family Agency therapist reported CT Page 8458 that she had missed 11 out of 26 scheduled appointments and had a poor prognosis for change. (Id.).
Damion has been in the same foster placement continuously since 11/2/89. He has manifested a multiplicity of learning and emotional problems which reportedly were exacerbated after visits with his mother. (Id., p. 23-24.) After a month's hospitalization in early 1992, his primary therapist concluded that his mother ". . . is not seen as an appropriate parental figure" for Damion and that any "visitation between her and the patient [Damion] needs to be supervised, [but] it is not as clear whether these visits should occur at all." (Id., p. 24-25.)
The State offered testimony from two psychologists (Mantell and Meier), three DCYS social workers (Taylor, Plante and Gross), a parent aid (Kanyock) and her supervisor (Glazer), two of Damion's therapists (Maschka and Scanlon) and one of Tabitha's (Stackpole) as well as Tabitha's foster mother, Karen R. As documentary evidence, the state offered, inter alia, written reports by Dr. Mantell (Exhibits 1, 2 and 3) and by Dr. Meier (Exhibits 18 and 19), Social Histories and reports submitted by DCYS to the court at various proceedings between May of 1987 and December of 1993 (Exhibits 5 through 13; 20 through 26). The mother submitted as exhibits correspondence from DCYS relating to Tabitha's placement in December of 1993 (Respondent's Ex. B), a letter from her counsellor at Child and Family Agency documenting her attendance at counselling sessions after June of 1993 (Respondent's Ex. C) and a doctor's letter substantiating her ear problems between 1988 and 1993 as well as medical records from Lawrence and Memorial Hospital documenting a variety of medical consultations between 1991 and 1993. Patsy did not testify herself nor did she call any witnesses on her behalf, either her therapist, friends, relatives or references of any kind.
* * *
ADJUDICATION — on facts as of 10/24/92:
The record supports overwhelmingly the conclusion that Patsy, on the adjudicatory date, was no nearer to being able to provide adequately for the care of either of these children than she had been when she admitted to neglecting them two and one-third years earlier, on 6/19/90. Her ability to handle Damion appropriately, even during the sporadic and brief visits that took place, remained marginal at best. In apparent recognition of this, Patsy CT Page 8459 has never requested that he be returned to her care, as she has repeatedly requested Tabitha's return. Her continued strong connection with Tabitha has caused that child's placement to be repeatedly changed, leaving Tabitha with only negative memories of the times spent with her mother.
 Tabitha said she did not like being at home during the year she was with her mother. She added that people would come and stay in her room, and she would have to sleep in the living room. The child made no references to missing mother, wanting to see her, or wanting to be at home with her, and expressed nothing that indicated an emotional attachment.
(State's Ex. 18, p. 4.)
Interviewing Damion, who had not lived with his mother for the last nearly four years of his seven year life, the child did not recall living with his mother and said that while he likes to visits and talking with her, when he was not visiting he did not think about her much. (Id.)
Dr. Meier found that most available interventions had already been attempted (Id., p. 6), that Patsy blamed others for not doing enough to help her but did not assume any responsibility herself. (Id.) He concluded:
 Given her present personality pattern, her history as indicated by her, the information in the petitions, and the observed focus of attention on her own immediate needs, the prognosis for major change is poor. (Id., p. 7.)
He recommended that decisions regarding permanent placement be made as soon as possible for both children (Id., pp. 8, 9.) Observing their interactions, Dr. Meier found that while Patsy ". . . verbalizes that she cares for the child . . . [she] does not appear comfortable with them, has difficulty setting limits in an appropriate way, and has limited understanding of their concerns and needs." (Id., p. 10.) He predicted that it was ". . . not likely she could meet the children's special needs" and that "Continued false expectations on the part of the children could lead to CT Page 8460 increased harm and greater difficulties for them in the future." (Id.) He concluded that despite the fact that "adequate intervention and services have been offered and provided" in the past, mother continues to deny problems, blames others for her difficulties, demonstrates little insight into her problems:
 Given her behavior in the past, and her present attitude toward intervention, the likelihood of any dramatic change in her willingness to participate and make a commitment to such services is poor." (Id., p. 11.)
Based upon the foregoing it is found by clear and convincing evidence that Patsy, a parent of children who have been found by the superior court to have been neglected or uncared for in TWO prior proceedings, by 10/16/92 had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child[ren];, . . . [she] could assume a responsible position in the life of the child[ren]" within the meaning of Sec. 17a-112, subsection (b)(2). This record amply supports Dr. Meier's conclusions: Patsy continued, to within one month of the adjudicatory date, to change boyfriends, fiances, housemates and lodgings with disheartening regularity. A multiplicity of services had been repeatedly offered to her over a period of five years, some of which she had briefly explored during times of threatened court actions, but by the adjudicatory date all services had been discontinued because of her failure to follow through and/or to evidence any lasting benefit from them. She has never acknowledged fault in parenting or evidenced adequate understanding of the children's multiple special needs.
With regard to the second ground pleaded — the denial by reason of parental acts of commission or omission the care, guidance or control necessary for their physical, educational, moral or emotional well-being — this must be dismissed as to both children:
1) Damion has been out of his mother's physical and legal custody continuously since 7/28/89 when DCYS secured temporary custody which remained in place until his commitment on 6/19/90. That commitment has been twice extended pursuant to subsection (e) of Section 46b-129. No evidence was offered as to the nature of care that had been denied to Damion during the 12 or more months CT Page 8461 preceding the filing of this petition, or, if any care had been withheld, how it could have been the responsibility of a parent who had not had legal custody for three years preceding the adjudicatory date.
2) While Tabitha was exposed to much negative adult behaviors while living with her mother between March of 1991 and February of 1992, DCYS was well aware of this when it agreed to permit Tabitha's return to Patsy's home, when it initially petitioned to reopen the judgment and restore guardianship to Patsy, and when it requested extension of the period of Protective Supervision. If Tabitha was denied necessary care, guidance and control during that 11 month period, it is as much the responsibility of DCYS, which permitted and condoned continuation of that situation, as it was of her mother. It is significant that DCYS did not argue in support of this ground for terminating Patsy's parental rights in its trial memorandum. It can, therefore, be regarded as having been abandoned and is therefore dismissed.
The petitioner has not pleaded the absence of any parent-child relationship under circumstances suggesting that such relationship could not be established or reestablished within a period that would not be detrimental to these children, despite the clear conclusions of Dr. Meier:
 The children do not appear to have positive memories or positive feelings for mother, and Tabitha expresses clearly and openly a preference not to return to mother. Damion demonstrates no more attachment to mother than he does to others he meets or with whom he interacts. Given the amount of time the children have been in placement, the relatively minor role mother has played in their lives, and their dependence on others for their basic needs, it does not appear that there is an on-going parent child relationship . . . Given mother's history of the past several years, her continued denial of problems, and her failure to place the needs of her children in a priority position, along with the lack of trust and attachment the children feel for mother, it is unlikely that mother will be able to resume a responsible position in the lives of these CT Page 8462 children within a reasonable period of time.
Had it been pleaded and argued, this court would have been compelled to find that this ground, too, had been made out by clear and convincing proof, notwithstanding the dictum in cases with very different facts than those found here. cf In Re ValerieD., 223 Conn. 492 (1992); In Re Kelly S., 29 Conn. App. 600
(1992).
DISPOSITION — as of the final trial date, 3/7/94.
In the dispositional phase of a termination case, the sole question is not whether the grounds found as of the adjudicatory date continue to exist but rather whether termination, on the dispositional date, is in the children's best interests. Clearly, if, in the interim, a parent has made strides toward rehabilitation, or has rectified the situation that led to the conclusion of abandonment, these later facts might well suggest that termination is NOT in a child's best interests; it would not, however, negate the original finding that such grounds existed at the earlier date.
In this case, in the absence of any evidence offered by the respondent as to changes in her situation in the 16 intervening months, the court must rely on the evidence that was put into the record: Testimony of DCYS workers and of Dr. Meier in his later evaluation, (State's Ex. 19) and the Addendum to the Social Study mandated by subsection (8) of Sec. 17a-112 incorporating by reference subsection (e)(1) of Sec. 45a-717 (State's Ex. 26). Neither document, nor the testimony supporting them, suggests that the best interests of either child would be served by denying termination and continuing the uncertainty of placement under which they have been living for the preceding seven years — since their original placement with Aunt Mavis — or, at minimum, for the nearly five years since they were returned to foster care. Whether the children remain with their present foster parents, are placed in more appropriate foster homes, or are placed in adoption with foster parents or with strangers, it is unequivocally clear that the time has long passed for the biological mother to stop being held out to them as their potential permanent caretaker. This court is not required to decide what plan is ultimately found to be in the best interests of each child; it is only required to find, by clear and convincing proof, that the continuation of their mother's residual parental rights is inconsistent with their best interests and it is hereby so found. While the court may CT Page 8463 find that DCYS behaved unconscionably by discussing adoption with these troubled children long before trial even began, much less decision rendered thereon, the remedy is not to render a disposition that is inconsistent with their best interests. The unconscionable behavior was exacerbated during the pendency of this action by taking the children to "adoption parties" before they were free to be adopted, and by consideration of removing Tabitha from her present foster home to another, not because it could better meet her special needs but because it was represented to be her "adoptive home". This unfortunate activity, however, deserves some sanction other than maintaining them in a situation that clinical experts have found to be destructive to their best interests for four and one-half years.
Before an order of termination may enter, however, the court must consider and make findings on seven matters set forth in subsection (d) of Sec. 17a-112:
 [Note: At the time of the filing of these petitions in October of 1992, only six findings were mandated to be made by the court contemplating termination of parental rights pursuant to subsection (d) of § 17a-112. By the dispositional date of 3/7/94, P.A 93-193, § 1, had added a seventh such finding. Because these findings are dispositional in nature —" . . . in determining whether to terminate parental rights under this section, the court shall consider and make written findings regarding: . . ." — this court will consider all seven findings as found in this subsection as of 10/1/93. See In Re: Barbara J., 215 Conn. 31 (1990), In Re: Romano M., 229, 345 (1945)].
1. The services which DCYS offered or provided to Patsy and these children to facilitate their reunification were timely, appropriate and exhaustive. Referrals were made not once but a number of times to various helping agencies (parent aids, counselling resources, parenting classes). If any fault is to be found with the proffer of services made by the state to this mother over the course of more than six years, it is that they were offered for a period of time far beyond that which these children should have been required to wait. Eighteen months after the children had been originally placed, Dr. Mantell, recognizing CT Page 8464 some positives in the relationship between mother and children, did not recommend their removal five months after their first reunification. But he cautioned that a full year of Protective Supervision should be required to ensure that Patsy received necessary parental counselling and that the children be monitored psychologically. Exactly one year following this evaluation, Patsy herself asked for the children to be replaced in foster care. In his updated recommendation of October of 1989, Dr. Mantell recommended unequivocally that visitation should cease and that termination of parental rights be considered, predicting that the consequences of NOT terminating would be "two psychologically maladjusted and behaviorally disordered children who will be incapable of taking their place in society." In his testimony of 1/14/92 he ascribed Patsy's "limited unpredictable, inappropriate and inadequate parenting," observed on all occasions that he had seen her in 1988 and 1989, to emotional and intellectual disabilities stemming from characterological problems caused by her own troubled upbringing. This had resulted in her inability to meet the needs of children and rendered her unable to benefit from the array of services that had been, or could be, offered. He repeated at trial (1/14/94) his prediction of four years earlier that if parental rights were not terminated the children would be "lost forever." Yet DCYS continued to offer services, even moving Tabitha back for one more abortive attempt at reunification, for two years following Dr. Mantell's 1989 recommendation. To have offered any further services or to have prolonged permanency planning any longer would have made the statutory requirement that DCYS consider the best interests of children an empty farce.
2. The department made efforts that far exceeded those that would be regarded as "reasonable" under the Federal Child Welfare Act of 1980 as amended. The prolongation of these efforts after 1989 might be regarded as reasonable from Patsy's standpoint; it was an unreasonable prolongation from the point of view of the children's best interests.
3. While not orders, court expectations and service agreements were executed by Patsy on numerous occasions. She was unable to sustain involvement in any form of treatment, for herself or to aid her parenting skills, for any period long enough to effect lasting change. She remains as she was seven years ago: Lacking a home of her own, lasting supportive relationships or the acknowledgment of her children's needs and her share of the responsibility for them. She remains intensely preoccupied with CT Page 8465 meeting her own needs, both physically and emotionally. While her own troubled childhood undoubtedly resulted in this preoccupation, its origins must not be permitted to outweigh their negative impact on her parenting capacity in the dispositional phase of this action.
4. Both children evidence feelings for and emotional ties with their mother as a result of her visiting, however irregularly, over the course of the last six and one-half years. Both children have developed significant emotional ties with their respective long term caretakers, neither of whom appear to be adoption candidates but both of whom are willing to keep the children as long as it appears to serve their best interests. The second clinical psychologist to evaluate this family, Dr. Meier, saw them in February and again in December of 1993. In his testimony of 1/26/94, Dr. Meier found that after years of offered services, Patsy still lacked any realistic perception of her problems and remained unaware of her own strong dependency needs. In her conflicts with Tabitha she regards herself as the child's peer rather than adult caretaker with detrimental effect on the child. She lacks the insight to deal with the anger which her children feel after being uncertain of their placements and of their contacts with the mother over such a long period. As had Dr. Mantell four years earlier, Dr. Meier found it unlikely that she could achieve any major change in gaining the insight necessary to provide adequate care to these children due to her limited intelligence hampered by her unrecognized dependency needs. Dr. Meier found her interactions very inappropriate with children who need an unusual degree of consistency, predictability and structure. Even during brief sessions in his office, Dr. Meier found Patsy unable to deal with Damion's misbehavior. Her response to the children's evident jealousy was to enhance it by presenting them with large material gifts. There is unlikely to be any change in the personality characteristics that prevent her from making her children feel secure enough not to need large material rewards for acceptable behavior. Patsy did not recognize any problems with Tabitha who Dr. Meier saw as having a number of special needs: her precociously adult behavior, particularly toward her mother; her lack of internalized values; the encopresis which increases with stress evidencing the repression of feelings; her lack of trust, loyalty and honesty — all of these require a more consistent, caring, predictable and structured home than the mother can provide. According to Dr. Meier: "She has been in foster care too long now." Whether or not adopted, it is important for Tabitha to have someone else assume responsibility CT Page 8466 for her placement and to have the uncertainty of the role that her mother will play in her life removed. Patsy acknowledged that Damion, who Dr. Meier saw as intensely angry, had problems, but she showed no insight when asked how she would deal with them. Dr. Meier concluded that termination would not be highly traumatic for either child but that continuation in permanent foster care would be. Even if adoption proves not to be an option for either or both children, they need closure, at last, to even the possibility of returning to their mother's case.
5. Tabitha turned 10 shortly before the dispositional date of these proceedings; Damion turned eight soon after. Tabitha has been placed in foster care three times in less than seven years; Damion has remained in foster care continually since July of 1989, his second foster placement since before his first birthday. Both Dr. Mantell in 1989 and Dr. Meier four years later strongly recommended ending the uncertainty of foster placement for these special needs children. The mother offered no clinical evidence to counter this view.
6. Patsy has appeared to make efforts in the past to adjust her circumstances, conduct or conditions to make it in the children's best interest to return to her home. She has started a number of treatment programs, but all have been discontinued because of her lack of follow through. She continues to live in unstable relationships and to show little insight into her children's problems, their origins or her role in their solutions. No evidence was offered as to her present situation; her last known residence was with a married man with whom she was "just friends" and on whose bounty she appeared largely dependent for her own welfare. While she has continued visitation and has maintained contact with DCYS throughout most of this period, she remains essentially the same Patsy W. whose children were placed in foster care in October of 1986 and again in July of 1989 and, in Tabitha's case, again in February of 1992. These efforts do not appear to have sufficiently improved her capacity for sustained adequate parenting.
7. No one prevented Patsy from maintaining a meaningful relationship with either child. Visitation was permitted — even encouraged — long after it was counterindicated by Dr. Mantell. Economic circumstances have never been suggested as a cause of the conflicted relationship between Patsy and these children.
JUDGMENT AND ORDERS
CT Page 8467
Having considered the foregoing, and giving weight to the unrefuted recommendations of two independent clinical psychologists over a period of more than four years, it is found by clear and convincing evidence to be in the best interests of both of these children for the parental rights of their mother to be terminated. If adoption can be secured for one or both of them, that would clearly be the best possible alternative to their near-life times in foster care. But even if adoption proves not to be an option, the closure of the relationship with their mother as a placement option is clearly required for the emotional and psychological well-being.
Therefore, it is ORDERED that the parental rights of Patsy W. in and to her children Tabitha P. and Damion P. be, and hereby areterminated. Since the parental rights of the fathers of these children were previously so terminated, it is further ORDERED that the Commissioner of Children and Families be appointed Statutory Parent for the purpose of implementing a permanent placement plan for each of these children as expeditiously as possible, and, to assure achievement of this end, a written report is ORDERED to be submitted to this court within 90 days of the date of this judgment. If adoption is not then finalized for either child, the said Commissioner is further ORDERED to submit to this court Motions for Review of Placement for Terminated Child no later than fourteen months from the date of this judgment so that they may be heard in court within 15 months of such date.
POST JUDGMENT ORDERS
1. Petitions to seek extensions of commitment are ordered to be filed on behalf of Damion on or before 9/20/94 and on behalf of Tabitha on or before 11/24/94. If such petitions are not filed by those dates the petitioner is ORDERED to appear in court on the next court day following to show cause why a citation for contempt should not issue.
2. The respondent's obligation to make reasonable efforts to reunify these children with their mother is ended so long as this judgment remains unreversed. The Commissioner is therefore ORDERED to permit only such visitation and provide each child with only such placements as are consistent with the best interests of that child, giving due consideration to the recommendation of the clinical evaluators in this case as well as to those of the children's individual therapists. CT Page 8468
3. It is further ORDERED that the appointment of the children's counsel and guardian ad litem shall be deemed to continue until such time as both children may be adopted or shall reach the age of majority, whichever occurs first. The Commissioner is further ORDERED to give notice to the children's counsel and guardian ad litem in advance of any proposed change in placement, and of the time and place for each administrative review of treatment plan.
Entered at Montville this 8th day of August 1994
FREDERICA S. BRENNEMAN, JUDGE