CHESTER A. KURAS ET AL. *v.* WALTER R. KOPE ET AL.
(13107)

WALTER R. KOPE ET AL. *v.* CHESTER A. KURAS ET AL.
(13108)

HEALEY, SHEA, GLASS, COVELLO and HULL, Js.

Argued October 2—decision released November 24, 1987

*Thomas P. Arvantely,* for the appellants (defendants in the first case, plaintiffs in the second case).

*Richard P. Weinstein,* for the appellees (plaintiffs in the first case, defendants in the second case).

ARTHUR H. HEALEY, J. These appeals involve the disputes concerning an easement by prescription in favor of Walter and Helen Kope over a right-of-way, approximately 1900 feet long, on real property in Suffield owned by Chester and Sarah Kuras. A Superior Court

judgment in 1982[1] decreed that the Kopes' predecessors in title, Ara and Martha Dildilian, had established an easement by prescription over a dirt road on the Kurases' property and in doing so, it enjoined the Kurases from interfering with the Kopes' right to use the right-of-way. In 1984, the Kurases brought an action against the Kopes in which they sought a declaratory judgment defining the width, scope and nature of the improvements to the easement that the Kopes could make, injunctive relief restraining the Kopes from expanding, improving or broadening the scope of the easement, monetary damages and other relief. Shortly thereafter the Kopes instituted an action against the Kurases seeking injunctive relief, monetary relief and other equitable relief for their alleged interference with the Kopes' use of the right-of-way. Both cases were tried together in the trial court, *O'Neill, J.,* and argued together in this court.

The Kuras parcel is farm property located on the southerly side of Mountain Road, a town highway, in Suffield. The Kope parcel, which is 30.53 acres, abuts the southerly side of the Kuras parcel. The Kope parcel has no frontage on any highway but it does have access to Mountain Road by virtue of the right-of-way in dispute. The Kopes purchased this property in 1983 after the 1982 Superior Court judgment had established the right-of-way in the Dildilians and "their heirs and assigns." The court's, *Bernstein, J.,* memorandum of decision in 1982 discloses, inter alia, that the Whipples purchased the dominant property (now owned by the Kopes) in 1925, that the Whipples constructed a "dwelling" on it shortly thereafter, that the Whipples sold to the Dildilians in 1946 and that "[i]n all the years that

---

[1] The memorandum of decision in the 1982 Superior Court action, i.e., *Ara T. Dildilian* v. *Chester A. Kuras,* Superior Court, judicial district of Hartford-New Britain, Docket No. 1426257 (October 7, 1982), was an exhibit in the trial court.

the Whipples and Dildilians owned it, no one, including the neighbors and defendants [the Kurases], questioned their right to use the road."[2] That memorandum also noted that when the bridge over the stream that crossed the right-of-way as it entered the Kope parcel "washed out the [Dildilians] re-planked it." When the Kurases fenced off the right-of-way with a gate "occasionally to fence in his cattle he [Chester Kuras] notified [the Dildilians] so that they would in no way be inconvenienced."

The trial court, *O'Neill, J.,* opined that the 1982 judgment found that the right-of-way was a "dirt road" and that it was subject to "flood." It also noted that the 1982 court "specifically found that the road 'was never much wider than a common wagon backroad subsequently made accessible by auto; and it was always subject to climatic conditions.' " The trial court, *O'Neill, J.,* pointed out that the 1982 court's "ultimate finding was that Kopes' predecessors in title 'their heirs, and assigns have a right of way over the land of . . . [Kuras] along the path indicated in . . . [a] survey done by W. E. Savage, Jr., Land Surveyor . . . [which was in evidence in the present trial].' " The "path" in the Savage survey was, the trial court said, shown by dotted lines "clearly not drawn to scale" with the "path" appearing at its "widest" to be 25 feet and at its "narrowest," about six feet. The trial court, *O'Neill, J.,* rejected the Savage survey and used that of Charles E. Davis, a licensed surveyor, who testified at the trial. In doing so, the trial court found that the right-of-way was "but 10 feet" as shown on the Davis survey and not "up to 20 feet" as the Kopes claimed. It recognized that the Kopes had obtained a variance[3] from the

---

[2] There was evidence at the trial of the case on appeal here that the Kuras family had owned its farm property since "around 1900."

[3] The Kurases appealed the decision of the Suffield zoning board of appeals that granted the variance to the Superior Court. That court affirmed the granting of the variance and no appeal was taken from that court's decision.

Suffield zoning board of appeals allowing them to construct a year-round residence on their parcel and that that variance was required because the Kope parcel had no frontage on Mountain Road. That court determined that the zoning board of appeals had "concluded" that the Kopes' right-of-way across the Kuras parcel was "adequate for the granting of the variance" to which no conditions had been attached.

The trial court, *O'Neill, J.,* viewed the property in March, 1986, traversing it in part in a four-wheel drive vehicle and in part on foot. Running south-southeast on the westerly side of the "right-of-way area for a considerable distance is a ditch." The land to the west of the "right-of-way area" is almost uniformly higher than the "right-of-way area," whereas the land to the east of the "right-of-way area" is almost uniformly lower than the "right-of-way area." The right-of-way is about 70 percent to 80 percent grass or weeds and is crowned in the middle "in large part." There are tracks that are 5 to 5 1/2 feet apart within the right-of-way and there are many potholes in the tracks with some of them being 12 to 15 inches deep. Moreover, even disregarding the potholes, "there are certain stretches where the tracks are as much as 10 to 15 inches lower than the crown of the right-of-way." In certain places, the distance between the westerly upslope and the easterly downslope or between an old tree or large rock on one side and a drop-off or upslope on the other side is only 10 to 12 feet. There is a "dump"[4] area along one of the narrow stretches of the right-of-way and in that stretch the Kopes had recently deposited some sand and stone for a distance of less than 100 feet. With this exception, no gravel, processed stone or any other material has been added to the right-of-way.

---

[4] The trial court found that "one of the narrow stretches of the right-of-way area (10-12 feet) runs along a dump of old vehicles, tires, boxes and other human discards on the easterly side of the right-of-way area." This area, according to the trial testimony of Chester Kuras, is a "farm dump."

Although the Kurases maintain fencing parallel to a considerable portion of the right-of-way, that fencing, as it presently exists, is not a source of obstruction to the use of the right-of-way. Kuras had maintained a large water tank on the westerly side of the right-of-way and a pipe from that tank, running across the road to the east, had been removed at the time the court viewed the area. In the "northerly portions" of the right-of-way, the Kurases have a pole gate from which they have removed the poles.

There is a stream that runs roughly east and west across the right-of-way a few hundred feet south of the northerly terminus of the right-of-way. The northerly terminus is the terminus nearest Mountain Road. In order to cross this stream, a person, animal or vehicle must "ford" it and the drop from the bank to the low point in that ford is not less than two feet.

Near the southerly terminus of the right-of-way, about where the Kope parcel is situated, there is another stream that once had a wooden bridge across it, but the wooden crossing members of the bridge are "almost totally gone." The stone abutments that supported the crossing members of this bridge are still present "and appear capable, with some tidying, of supporting new crossing members."

Further, the trial court determined that "the right-of-way appears not to have been formed by any agency of man other than use" and that it could find "no indication on the site that the right-of-way had ever been graded or that a plow had been used for snow removal." It also pointed out that two vehicles could not pass on the claimed right-of-way between the physical impediments on each side of the area over most of the length of the right-of-way.

After conducting the trial and viewing the locus in quo, the trial court made a number of determinations:[5] Because the Kopes' right to the use of the "dirt road" was established by prescription, it was limited to the use that established it. The Kopes were only entitled to a right-of-way about ten feet in width, and, therefore, the Kurases were entitled to an injunction rejecting the Kopes' claim of a right-of-way twenty feet in width. It decided that the Kopes' legal rights to injunctive relief were "essentially" the same as those of the Kurases which would include the enjoining of the Kurases from interfering with the use of the right-of-way by the Kopes.

It further ordered that the right-of-way was defined as set forth in the Davis survey ("about 10 feet wide") except that the curve at the "southerly end" was found "not to curve out to the west but to continue N 32° - 10' - 07 E i.e. across the old bridge area."[6] The ditches were not part of the right-of-way nor was any area to its east or west "as depicted on the survey [Davis] which is in many places relatively flat."

Although deciding that the right-of-way could be used at all times of the year, it found that the Kopes had no right to construct a bridge on the northerly portion of the right-of-way to cross the stream they "ford" and had no right "to add either above or below ground, any poles, wires, pipes or other materials for the transpor-

---

[5] The trial court's determinations must, of course, be considered in the light of the judgment entered in the 1982 action by the Superior Court, *Bernstein, J.,* which decided that the Dildilians had established a right-of-way by prescription.

[6] There was evidence at the trial that "out of necessity" to gain access to the Kope parcel, the Kopes, because the south bridge could not be used, would go around that bridge "slightly to the west" and "cross the stream bed." It is a fair inference from the trial court's order here that the right-of-way extends over the damaged bridge that will be repaired and that the Kopes may no longer curve out from the right-of-way and use the bed of the stream to cross to their parcel.

tation or transmission of any materials, electricity, or communication." Although the Kopes had the right to "maintain" the right-of-way as a "dirt road," they could not add stone, gravel or sand to it but only fill the "potholes" with "dirt." They could not grade the "present crown nor raise the tracks" although they could trim bushes and tree branches along the right-of-way that interfered with their use. In addition, the Kopes had no right to build "slopes" on the area along the right-of-way. They had, however, in the building of their residence, the right "to bring in the normal equipment and materials to be used to erect a residence" as well as "rubber tired vehicle[s] necessary construction equipment such as backhoes and bulldozers."

During those periods when the Kurases needed gates for farm animals, they were allowed to maintain two gates that were hinged and pivoted for ease of opening and closing. These gates, at designated locations, were not to be locked by any party and the Kopes were responsible for closing the gates after using them. The Kurases were permitted to maintain an underground water pipe that crossed the right-of-way. In addition, the Kurases could use their property in any way that they desired so long as they did not interfere with the Kopes' right to use the right-of-way. In each case, the Kopes appealed to the Appellate Court and both cases were transferred to this court pursuant to Practice Book § 4023. We find error and remand with direction.

The basic issue on the Kopes' appeal is their claim that the trial court erred in restricting the nature of the improvements that may be made to the right-of-way over the Kuras parcel. Essentially, the Kopes maintain that they are entitled to make the following improvements: grade the right-of-way, lay gravel or asphalt on the right-of-way, repair the damaged bridge over the stream which is near the southerly terminus of the right-of-way, construct a bridge or culvert at the

stream ("the north ford"), which now must be "forded" and install, within the right-of-way, underground utilities for electric and telephone service.

The Kopes claim that the trial court's denial of their right to make these improvements to the right-of-way has taken away all rights incident and necessary to its enjoyment and has taken away "its practical usefulness." Maintaining that their proposed improvements are in keeping with the nature and use of the prescriptive right-of-way, the Kopes urge that their proposals are reasonable and "as little burdensome" to the Kuras parcel as the nature and purpose of this easement permits. Invoking Judge Bernstein's 1982 decision concerning ingress and egress to their parcel, they claim that our cases indicate that because the right-of-way has been established, they have the right to so improve it so long as it is done only for purposes related to the ingress and egress from their residence. On this branch of the issue, they also refer for support to the Restatement of Property. See, e.g., 5 Restatement, Property §§ 478, 479. Arguing that the issue is how uses required by new needs can be justified by uses that satisfied old needs, the Kopes contend that the new needs, as evidenced by the proposed improvements, must be satisfied if their prescriptive easement is to be effective. They also claim that some findings of the trial court contradict certain of its conclusions, particularly its conclusion that the right-of-way was not formed by any agency of man other than use.

On the other hand, the Kurases claim that the rulings of the trial court are consistent with the law on prescriptive easements and the earlier decision of Judge Bernstein. Arguing that the "dirt road" is limited to the original use that gave rise to the prescriptive right, they contend that the proposed improvements expand, alter and increase the burden on the servient estate beyond its original use and purpose. In doing so, the

Kurases claim that the Kopes have failed to distinguish between easements by prescription and easements by grant. They reject the notion that the Kopes' proposed improvements in the right-of-way should consider the "evolution" of their parcel upon which a residence is to be built. Arguing that the Kopes "are able to freely pass" over the right-of-way and that the trial court's rulings should not be disturbed, they stress that its decision is based not only on the trial court's, *O'Neill, J.,* assessment of the witnesses and the evidence at the trial, but also on the trial court's personal observations of the actual area involved.

"It is well settled that when an easement is established by prescription, the common and ordinary use which establishes the right also limits and qualifies it." *Hawley* v. *McCabe,* 117 Conn. 558, 560, 169 A. 192 (1933); see *New Canaan Country School, Inc.* v. *Rayward,* 144 Conn. 637, 640–41, 136 A.2d 742 (1957); *Aksomitas* v. *South End Realty Co.,* 136 Conn. 277, 281, 70 A.2d 552 (1949); L. Jones, Easements § 415; 5 Restatement, Property §§ 477, 478. " 'The use of an easement must be reasonable and as little burdensome to the servient estate as the nature of the easement and the purpose will permit.' " *Center Drive-In Theatre, Inc.* v. *Derby,* 166 Conn. 460, 465, 352 A.2d 304 (1974), quoting 2 G. Thompson, Real Property (1961 Replacement) § 427, p. 699; see *Aksomitas* v. *South End Realty Co.,* supra. "Ordinarily when [judicial] opinions speak of the 'use' of an easement, it arises in right-of-way cases. Thus 'use' frequently involves the amount of traffic over the easement or alterations to the land to make it passable." *Center Drive-In Theatre, Inc.* v. *Derby,* supra. This is not to overlook, however, that "[t]he owner of an easement has all rights incident or necessary to its proper enjoyment, [although] nothing more." *Peterson* v. *Oxford,* 189 Conn. 740, 745, 459 A.2d 100 (1983); *Center Drive-In Theatre, Inc.* v. *Derby,*

supra, 464; see 25 Am. Jur. 2d, Easements and Licenses § 72; 5 Restatement, Property § 486. With reference to the owner of a prescriptive right-of-way over the farm of the other party, long ago we said: "The owner of the right of way may repair it, and do whatever is reasonably necessary to make it suitable and convenient for his use." *Nichols* v. *Peck,* 70 Conn. 439, 441, 39 A. 803 (1898). We have said that "[t]he right of an owner of an easement and the right of the owner of the land are not absolute, but are so limited, each by the other, that there may be a reasonable enjoyment of both. 2 Thompson, Real Property (1980 Replacement) § 427." *Peterson* v. *Oxford,* supra. One treatise points out that the "scope" of an easement "is what its holder may do with it, the purposes for which it may be used." R. Cunningham, W. Stoebuck & D. Whitman, The Law of Property (1984) § 8.9, p. 458.

Even though the common and ordinary use which establishes the prescriptive right also limits and qualifies it, as one court aptly observed, "the use made during the prescriptive period does not fix the scope of the easement *eternally.*" (Emphasis added.) *Glenn* v. *Poole,* 12 Mass. App. 292, 293, 423 N.E.2d 1030 (1981). One commentator in this field states that "[i]f it [the above announced rule] were applied with absolute strictness, the right acquired would frequently be of no utility whatsoever. A right-of-way, for instance, would, as has been judicially remarked . . . be available for use only by the people and the vehicles which have passed during the prescriptive period. But the rule is not applied with absolute strictness." 4 H. Tiffany, Real Property (3d Ed.) § 1208, p. 1039; see *Big Cottonwood Tanner Ditch Co.* v. *Moyle,* 109 Utah 213, 174 P.2d 148 (1946); *Cowling* v. *Higgenson,* 4 Mees & W 245 per Parke B (1838); 2 American Law of Property § 8.68. Another authority has said: "Since, however, no use can ever be exactly duplicated, some variation between the use

by which a prescriptive easement was created and the uses made under it after its creation is inevitable. The problem is to ascertain the limits of permissible variation." 3 R. Powell, Real Property (1987 Rev.) ¶ 416, pp. 34-204–205.

The right-of-way in the case before us is an easement appurtenant, which, by definition is one created to serve a dominant parcel of land. 3 R. Powell, supra, ¶ 418, p. 34-215, ¶ 405, p. 34-19. Because the owner of a prescriptive easement may repair it and do whatever is reasonably necessary to make it suitable and convenient for his use; *Nichols* v. *Peck*, supra; it is reasonable to assume that both dominant and servient owners would anticipate, as in this case, that an established right-of-way for ingress and egress to a single-family residence may give rise to the necessity of improvements in that easement to render it of genuine benefit to the owner of the dominant tenement. See 2 American Law of Property § 8.69, p. 281; see also 5 Restatement, Property §§ 478, 479.

This rule is a foreseeable corollary of the proposition that the prescriptive right established is to continue to do the things the doing of which resulted in the creation of the easement. See 2 American Law of Property § 8.68, p. 280. In a word, legal contemplation in this context anticipates "evolutionary but not revolutionary changes." See generally R. Cunningham, W. Stoebuck & D. Whitman, supra, § 8.9, p. 459; 5 Restatement, Property § 479.

The desire and need for improvements in such a prescriptive easement for ingress and egress emerges from the evolution of the dominant parcel. The nature and scope of such improvements, however, cannot be fully foretold. Acknowledging that the interests and rights of both the dominant and servient tenements often conflict, the problem arises of how present needs

may be justified under a prescriptive right that apparently met the needs of another day. This brings into focus the proposition that the use and improvement of this prescriptive easement must not unreasonably burden the servient tenement that is already burdened with the easement. *Peterson* v. *Oxford,* supra, 745; *Center Drive-In Theatre, Inc.* v. *Derby,* supra, 465; see 5 Restatement, Property § 480, p. 3004; 2 G. Thompson, Real Property (1961 Replacement) § 427, p. 699; 4 H. Tiffany, supra, § 1209. Nevertheless, although the making of repairs and improvements necessary to the effective enjoyment of a prescriptive easement is incidental to the easement, repairs and improvements, and "particulary the latter," will not be permitted if they will unreasonably increase the burden on the servient tenement. 5 Restatement, Property § 480, p. 3006; see 25 Am. Jur. 2d, Easements and Licenses §§ 84 through 87.

It therefore appears that one who has a prescriptive easement has the privilege to do such acts as are reasonably necessary to make effective his enjoyment of the easement unless the burden on the servient tenement is thereby increased; *Nichols* v. *Peck,* supra; 5 Restatement, Property § 480. A right-of-way for ingress and egress by prescription is more than a *mere* right for ingress and egress; it involves those sensitive rights of use and enjoyment of that easement that render it genuinely passable without unreasonably burdening the servient tenement. The problem of the extent of the dominant owner's privilege in this context is largely a question of fact depending on the extent and nature of the lawful use of the easement. See *Nichols* v. *Peck,* supra, 441; *Massee* v. *Schiller,* 243 Ark. 572, 420 S.W.2d 839 (1967); *Gibbens* v. *Weisshaupt,* 98 Idaho 633, 570 P.2d 870 (1977); *Guillet* v. *Livernois,* 297 Mass. 337, 8 N.E.2d 921 (1937); *Mumrow* v. *Riddle,* 67 Mich. App. 693, 242 N.W.2d 489 (1976); *Martin* v. *Norris Public Power District,* 175 Neb. 815, 124

N.W.2d 221 (1963); 5 Restatement, Property §§ 478, 479; R. Cunningham, W. Stoebuck & D. Whitman, supra, § 8.9; 112 A.L.R. 1300; 25 Am. Jur. 2d, Easements and Licenses § 86. We must decide whether the trial court's determinations on the improvements sought by the Kopes are clearly erroneous.[7] Practice Book § 4061.

We take up first the Kopes' request to grade the right-of-way. The trial court decreed that the Kopes "may not grade the present crown [of the right-of-way] nor raise the tracks." A fair definition of the verb "grade" in this context is a physical change in the earthen surface by scraping and filling on that surface to reduce it to common level. See generally 38 C.J.S. 972, Grade; Webster, Third New International Dictionary. Mathematical certainty is not demanded, but grading on the ground itself which reasonably effectuates present enjoyment of this easement is. We will not reiterate all the evidence on this branch of the matter. We do, nevertheless, note that the trial court found

[7] It is claimed by the Kurases that not only did the trial court base its decision on the evidence adduced at the trial itself, but also on its making personal observations of the area involved, and, therefore, this court should not substitute its thinking for that of the trial court as it has not been proven that an "injustice has been done."

Information obtained through a visual observation of the locus in quo is just as much evidence in the case as any other evidence in the case. *Dooley v. Leo,* 184 Conn. 583, 587, 440 A.2d 236 (1981); *Romaniello v. Dyna Distributors, Inc.,* 154 Conn. 605, 606, 227 A.2d 430 (1967); W. Maltbie, Connecticut Appellate Procedure § 149. While a view arguably may tend to be more in the ken of demonstrative evidence than the spoken word from the witness stand or a photograph in evidence, the fact of a view does not require any modification of our clearly erroneous test on the review of a trial court decision.

This court does not, of course, find facts. In passing, however, on the trial court's findings, we have had the opportunity to examine some twenty-two color photographs of this right-of-way which were exhibits at the trial. Included in these was a set of nineteen photographs covering the entire length of the right-of-way and taken at one hundred foot intervals along its course.

that the right-of-way is "but 10 feet wide as shown on the Davis survey," that there are tracks that are 5 to 5 1/2 feet apart within the right-of-way and that there are many potholes with some being 12 to 15 inches deep. Significantly, it found that the right-of-way is "crowned in the middle in large part" and that there are "certain stretches where the tracks are as much as 10 to 15 inches lower than the crown of the right-of-way." The mere recital of these findings serves to make evident the need to permit this easement to be graded under all the circumstances of this case. The trial court's refusal to permit grading was clearly erroneous. Practice Book § 4061. Because, however, permitting this improvement requires additional factual determinations to be made before entering specific orders concerning such factors as the nature and extent of grading, we remand this issue to the trial court to conduct an evidentiary hearing for that purpose.

We next examine the request to lay asphalt or gravel on the right-of-way. The laying of asphalt or gravel on the right-of-way[8] raises questions that are factual. The trial court's order that prohibited the use of any gravel was clearly erroneous. Practice Book § 4061. Whether laying asphalt or gravel, while facilitating the Kopes' use of the right-of-way, also will unreasonably increase the burden on the servient tenement is for the trial court to determine. Here, too, therefore, we remand for an evidentiary hearing for necessary orders on the issue of placing gravel on this easement.

We next address the request to "repair" the damaged bridge over the stream which is near the southerly terminus of the right-of-way, i.e., nearest the Kope parcel. Two initial observations should be made. First, as noted earlier, the trial court, in accepting the Davis sur-

---

[8] We note that the entire right-of-way is bounded on both sides by the lands owned by the Kurases.

vey as defining the right-of-way, made one correction to that survey. It did this when it ordered that that strip about 96.60 feet in length at the southerly end of the right-of-way not "curve out to the west," as shown on the Davis survey, "but to continue N 32°-10'-07 E i.e., across the old bridge area." It is a fair inference that the trial court did this because the evidence demonstrated that the bridge had been in disrepair for some years, had never been "rebuilt" and access to the dominant tenement was now by going around the damaged bridge and crossing in the stream bed. Second, as to this damaged bridge, which the trial court's decree made part of the right-of-way, facts found by it made clearly evident that the bridge was made "by [an] agency of man," given its findings that there "had [been] a wooden bridge across [the stream]," that the "wooden crossing members are almost totally gone," that "stone abutments" which supported the crossing members "are still present and appear capable, with some *tidying,* of supporting new crossing members for auto traffic." (Emphasis added.) Despite these findings, that portion of the trial court's memorandum of decision entitled "Decision and Orders" contains no order for the "repair" of this damaged bridge although its findings of fact implicitly concluded that it should be done. "The verb 'repair' has been defined to mean 'to restore to a sound or healthy state; to make good.' Webster, Third New International Dictionary." *John A. Errichetti Associates* v. *Boutin,* 183 Conn. 481, 490, 439 A.2d. 416 (1981). It contemplates some existing structure or thing which has become somewhat imperfect. *Childers* v. *Speer,* 63 Ga. App. 848, 12 S.E.2d 439 (1940); see *John A. Errichetti Associates* v. *Boutin,* supra, 489–90. Again, because the nature and extent of the necessary repairs involve certain factual determinations, we remand for an evidentiary hearing on this matter. We cannot, however, leave this matter

without observing that repairs reasonably necessary to this bridge could hardly increase the burden upon the servient tenement.

We come now to the trial court's order that the Kopes "have no right to construct a bridge on the northerly portion of the right-of-way to cross the stream they now 'ford.' " In order to cross this stream, the trial court found that a person, animal or vehicle must "ford" it and that the drop from its bank to the lowest point in the ford "is not less than 2 feet." According to the evidence at trial, there has never been a bridge over this stream. The Kopes argue that they be permitted to build a bridge over this "north ford." Based on the law and the evidence, this finding that the Kopes had no such right is clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980); cf. *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.,* 195 Conn. 60, 66, 485 A.2d 1296 (1985). The Kopes have the right to a reasonable enjoyment of their right-of-way without increasing the burden on the servient tenement; their request for bridging this stream merits serious consideration in the trial court. Consequently, because this matter also involves factual determinations, we remand this branch of the matter to the trial court for an evidentiary hearing upon which to base factual findings necessary for it to make appropriate orders to effectuate this right.

Finally, the Kopes claim that the trial court erred in not permitting them to install underground utility lines for electric and telephone service.[9] We do not agree. The rule is generally well established that the owner of an easement is entitled to relief upon a showing that

---

[9] Although the trial court made no specific finding on the Kopes' claim to install underground utilities, an examination of the briefs of the parties in the trial court indicates that the Kopes claimed the right to do this and that the Kurases opposed this claim.

he will be disturbed or obstructed in the exercise of his right. *Leabo* v. *Leninski,* 182 Conn. 611, 615, 438 A.2d 1153 (1981); see *Great Hill Lake, Inc.* v. *Caswell,* 126 Conn. 364, 11 A.2d 396 (1940). Again, however, this right must be balanced against the right of the servient owner not to have the existing servitude unreasonably increased. Counsel has not cited nor have we been able to discover any decision permitting underground utilities to be installed in a private right-of-way created by prescription for the purpose of access. Moreover, the Kopes themselves, in urging us to declare such a right, candidly acknowledged, in oral argument before us, their doubts of prevailing on this issue because of the lack of precedential authority to do so. In doing so, we were informed at oral argument that the Kopes have made other arrangements for a utility easement.[10]

In any event, we believe that in the circumstances of this case, the request for this "improvement" at this time exceeds, as a matter of law, the scope of the prescriptive easement that was found by Judge Bernstein in 1982. The Kopes argue that such a request takes into consideration needs that result from a normal evolution in the use of its land and that all land is subject to constant changes in its condition. They argue that the result of this changing nature of things means that these emerging "requirements" of dominant tenements must benefit them in their changed condition. Therefore, because the construction of a residence on the dominant tenement is a normal evolution in its use, the Kopes assert that such underground utility installation should be permitted as it

---

[10] During oral argument, the Kopes recognized that underground utilities, under existing law, might be considered too great a burden on the Kuras parcel, but nevertheless asked us to permit them to install permanent underground utilities. We decline to do so in this case. The Kopes also stated at oral argument that they had negotiated for and had acquired a utility easement to the south from a nonparty to this case.

would not "adversely affect" the use by the Kurases of the servient tenement.

Initially, this claim has some appeal, but, on more penetrating consideration, it is not persuasive in this case. A normal development is one that accords with common experience and, therefore, one that might reasonably have been foretold. 5 Restatement, Property § 479, comment (a). Such uses, however, must be consistent with the pattern formed by the adverse use by which the prescriptive easement was created. An adverse use for the prescriptive period does not create "a privilege to make thereafter all the uses required by the needs which might have been foreseen during that period. It creates only the privilege to make the uses required by the normal development of the conditions the needs of which were satisfied by the adverse uses made during the prescriptive period." Id., comment (b). That is not to say that uses required by such a development may not be satisfied although they differ from the uses made during the prescriptive period, but although some change in the character of the physical use of the servient tenement is so permitted, any change that unreasonably increases the burden on the servient tenement is not permitted. 5 Restatement, Property § 479, comments (a) and (b). "An unreasonable increase in burden is such a one as it is reasonable to assume would have provoked the owner of the land being used to interrupt the use had the increase occurred during the prescriptive period . . . [w]ithin reasonable limits, the possessor of the servient tenement is required to anticipate the future and guard against it. Obviously, he should not be required to guard against the unforeseeable. Hence, prescriptive interests do not include the privilege to make uses necessitated by a development of the dominant tenement not foreseeable during the prescriptive period as a normal development of that tenement." Id., comment (c).

In this specific case, not only is there no evidence concerning "utilities" that might or might not have served an energy or any telephonic function in the past, but there is also no evidence that, even in the normal evolution of the Kope parcel, any underground electric or telephone lines were ever reasonably foreseen on a right-of-way that traverses over one third of a mile through the entire Kuras parcel. Moreover, what "the possessor of the servient tenement may reasonably be expected to foresee depends in part upon the nature of the adverse use being made of the servient tenement. The more the use varies with changes in the current needs of the dominant tenement during the prescriptive period, the more the possessor of the servient tenement is required to anticipate and therefore to submit to future variations. The more precise the use and the less it varies according to the current needs of the dominant tenement during the prescriptive period, the less the possessor of the servient tenement is required to anticipate changes in accordance with the future needs of the dominant tenement." Id. The servient parcel has been in the Kuras family since about 1900 and has been used as a farm. It then would appear that its use as a farm has been fairly consistent for many years. The farm use even entails the right, ordered by the trial court, to maintain a water pipe "only *under*" the right-of-way. (Emphasis added.) In addition, the Kopes point to no finding—or even any evidence—that such utilities underground could be fairly foreseen by the servient tenement in this obviously rural setting.

We point out that our opinion on the underground utilities issue is in no sense a determination that a similar request under circumstances different from this case will necessarily yield the same result.

There is error, the case is remanded to the trial court for further proceedings not inconsistent with this opinion.

In this opinion the other justices concurred.