807 A.2d 695

**Robert J. BASSETT, et ux.**

v.

**Hale HARRISON, et al.**

No. 1633, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Sept. 11, 2002.

Robert B. Taylor (Adkins, Potts & Smethurst, LLP, Salisbury, Michael C. Vaeth, Snow Hill, on the brief), for appellants.

Hugh Cropper, IV, Anderson, Coe & King, LLP, Ocean City, Robert A. Eaton, Salisbury, on the brief, for appellees.

Argued before HOLLANDER, KRAUSER and THEODORE G. BLOOM (Ret'd Spec. Assigned) JJ.

KRAUSER, Judge.

This case involves a dispute between neighboring landowners, the Harrisons and the Bassetts, over the existence, use, and partial relocation of a right-of-way, known as "Woods

Road," over the Harrisons' property. That dispute led Hale Harrison, John H. Harrison, and Helen Harrison Faucette to file suit in the Circuit Court for Worcester County against Robert J. Bassett and his wife, Connie L. Bassett, to enjoin the Bassetts from using the right-of-way to haul sand and gravel from a borrow pit[1] on their property to a public highway and from using the "relocated" westerly portion of that right-of-way for any purpose whatsoever.

Following a bench trial, the circuit court rendered a decision that disappointed both sides. On the one hand, the court held, to the Harrisons' dismay, that the Bassetts had a right to use Woods Road and had acquired a prescriptive easement in the "relocated" westerly portion. On the other hand, it declared, to the Bassetts' dismay, that they could only use the relocated portion for personal and agricultural purposes and that the rest of Woods Road served only that portion of their property that had been conveyed in the deed that had created the right-of-way. Cross-appeals followed.

On appeal, the Bassetts present four issues, which we have set forth below as they appear in their brief:

I. Whether a right-of-way for an access road has been relocated onto a separate parcel of land if for many years, during which that land and the initial servient estate were under common ownership, the relocated portion of the road was used for access to the dominant estate and the original roadway has been abandoned.

II. Whether by alleging in the initial and amended complaints that a right-of-way has been moved onto his property its owner has admitted that the right-of-way has been relocated onto his property.

III. Whether a right-of-way granted without any limitation of its usage may be used for hauling sand and gravel if that usage does not adversely affect the servient estate.

---

1. Although neither side describes what a "borrow pit" is, it is commonly defined as an "excavated area where material has been dug for use as fill at another location." MERIAM WEBSTER'S COLLEGIATE DICTIONARY 133 (10th ed.2000).

IV. Whether a prescriptive easement based upon prior usage by trucks and other vehicles for farm operations and general access may be used by trucks for another purpose if the servient estate is not affected by such additional usage and its owners allow a third party to engage in similar usage of the roadway.

On cross-appeal, the Harrisons present two questions:

V. Did the trial court err when it granted appellants a prescriptive easement across the relocated portion of the right-of-way when there was no evidence that appellants' use was adverse?

VI. Did the trial court err when it granted appellants a prescriptive easement across the relocated portion of the right-of-way when appellants never pled a cause of action for prescriptive easement?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## Background

The Harrisons own a farm, known as the "Birch Farm." [2] Their neighbors, the Bassetts, own a 72 acre parcel of land that was originally acquired by William D. Bassitt [3] from the Harrison family in 1913. In the 1913 deed transferring ownership from Orlando and George Harrison and their wives to Bassitt, a right-of-way (Woods Road) was granted to Bassitt across the Harrisons' farm (Birch Farm). A dispute between the parties over the existence, present location, and permitted

---

**2.** The farm apparently bears the name of a previous owner, Joshua A. Birch. Our frequent use of that name to refer to the Harrisons' farm will no doubt cause some confusion but, if we were to abandon that designation now, it would only add to the confusion as that is the name that the parties used below and now use on appeal to designate the Harrisons' farm.

**3.** Although the last name of William Bassitt was spelled with an "i" and not "e" in the 1913 deed, we assume that William was a Bassett family member and the conveyance of the 72 acres stayed within that family. For the purposes of this opinion, it of course makes no difference: the legal issues and their resolution remain the same.

use of the right-of-way is the subject of this case. To describe that right-of-way, we shall divide it into three segments as the parties did below and rely on the drawing reproduced in appellants' brief at "App. 1," which we have attached to this opinion.

The right-of-way at issue, known as Woods Road, runs east and west, across the Harrisons' Birch Farm for one mile until it reaches U.S. 113, which runs north and south. Segment 1 is the easterly portion of that road. It consumes all but the last 600 feet of Woods Road up to U.S. 113. The last 600 feet, the westerly portion of the road, is Segment 2. These two connected segments constitute "Woods Road" and the total right-of-way granted William Bassitt in the 1913 deed.

At some point, Segment 2, the last 600 feet of Woods Road before it connects with U.S. 113, was abandoned in favor of Segment 3 which runs from Segment 1, the easterly portion of Woods Road, at about a thirty degree angle and in a southwesterly direction, crossing the northern tip of a parcel of land called the Evans lot [4] until it reaches U.S. 113. Although the use of the entire right-of-way to haul sand and gravel is in dispute, much of our discussion will focus on Segment 3 as that is the principal source of disagreement between the parties.

As noted, in 1913, Orlando Harrison, George Harrison, and their wives conveyed, by deed, 72 acres of their land to Bassitt, who, at that time, owned several acres of adjacent farm land. That deed also granted Bassitt the right to use Woods Road, which he and his successors-in-interest did, transporting farm and domestic goods and equipment over it.

Prior to 1938, Segment 2, the 600 foot westerly portion of Woods Road, was abandoned, and Segment 3, a southwesterly route to U.S. 113, crossing the Evans lot from Segment 1, came into use. At trial, the Harrisons' real estate expert testified that, at that time, the Birch Farm and the Evans lot

---

4. The Evans lot is also referred to in the record as the "Jenkins Willis lot."

were under different ownership. He further opined that, from the date that the 72 acre parcel of land was conveyed by the Harrisons to William D. Bassitt in 1913 until a foreclosure sale in 1944, the two properties were, for the most part, under different ownership.

The Bassetts disagreed. They contended at trial that title reports of the Harrison heirs showed that the Birch Farm and the Evans lot were under common ownership or at least "substantially" under common ownership "for almost 50 years" before the Harrisons conveyed the Evans lot to Andrew Evans and his wife. Those title reports, the Bassetts claimed, showed that from 1917 to 1929 both properties were owned by Orlando Harrison or George H. Harrison or their relatives and devisees. Then, in 1929, G. Hale Harrison became the owner of a two-thirds undivided interest in the Birch Farm and a co-owner of the Evans lot in partnership with his two brothers, Henry L. Harrison and John L. Harrison, trading as the "Harrison Brothers Partnership."

Since the relocation of the westerly portion of the right-of-way, Woods Road has been used for sundry purposes. The Harrisons have used the road for farming and agricultural purposes and as access to a borrow pit that their "family used in the '50s and '60s." Their neighbor, Randy Hastings, presently uses it, with their permission, to haul sand and gravel from his farm across Woods Road.

The Bassetts have also used the right-of-way to obtain access to their property and have done so for many years. Floyd Bassett testified that he used the Woods Road for hunting with other members of the Bassett family during the 1940's and 1950's. Moreover, Clive Bassett, appellants' father, who owned the farm from 1947 until his death, farmed the land and used the road for that purpose. And Connie Bassett testified that, beginning in the early 1960s, the Bassetts continued to use the road to haul grain and feed to or from the entire farm. While the Harrisons acknowledge that the Bassetts have used the road for such purposes, Hale Harrison testified that they were unaware that the Bassetts were

considering using the right-of-way to haul sand and gravel until 2000 "when the Bassets filed for a borrow pit application."

On October 10, 2000, the Harrisons filed the action now before us. As noted, the circuit court subsequently held that the Harrisons had granted the Bassetts a right-of-way across their property, the Birch Farm, but it was intended to serve only the 72 acres acquired by William D. Bassitt in 1913 and not rest of their the property, where the borrow pit was located. The court also held that the Bassetts had acquired a prescriptive easement [5] across the Evans lot (Segment 3) and that this prescriptive easement was limited to the right acquired during the prescriptive period to transport domestic and agricultural goods and equipment, and did not include "the right to pass and re-pass with trucks transporting sand and gravel." The court thereafter issued a written order declaring the rights and obligations of the parties consistent with its ruling, whereupon the parties filed cross-appeals.

## Discussion

### I.

The Bassetts contend that the circuit court erred in holding that the Harrisons could not have acquiesced in and consented to the relocation of the westerly portion of the right-of-way because the Harrisons' farm, known as the "Birch Farm," and the Evans lot were under different ownership or, as the circuit court put it, there was "no unity of title" between the two properties. Challenging that conclusion, the Bassetts maintain that from 1917 until 1963 "the Evans lot and the Birch Farm were in substantially common (or identical) ownership." Consequently, they assert that a "consensual change" in the location of the westerly portion of the right-of-way could and did occur. We disagree.

---

**5.** "A prescriptive easement arises when a party makes an adverse, exclusive, and uninterrupted use of another's real property for twenty years." *Kirby v. Hook*, 347 Md. 380, 392, 701 A.2d 397 (1997).

The circuit court correctly held that the Harrisons, as owners of the Birch Farm, could not have consented to the "relocation" of the right-of-way because there was no identity of ownership between Birch Farm and the Evans lot at the time of the relocation. The relocation, the parties agree, occurred sometime between 1913 and 1938. But neither side could pinpoint when, during that twenty-five year period, that happened. What is certain is that, from 1913 to 1917, the Harrisons had no ownership interest in the Evans lot. At that time, it was owned by the Henry family. Unfortunately, after that, the record of ownership for both properties becomes a bit murkier. The Bassets claim that, from 1917 until 1929, both properties were owned by Orlando and George Harrison. But the Harrisons disagree. They claim that, from 1913 to 1944, the properties were under different ownership. At trial, their real estate expert, Harold B. Gordy, Jr., testified that he believed, having completed a chain of title for the Birch Farm, that from 1929 to 1944 the ownership of the two properties differed.

The record does not disclose, however, whether the circuit court accepted or rejected the Bassetts' claim that at least from 1917 until 1929 the properties had identical ownership. But that does not matter because the circuit court did not find, as the Bassetts suggest, that there was never a common ownership of the two properties; it found only that there was no proof of common ownership "at the time of the relocation."

Given that neither side could state when, between 1913 and 1938, the relocation occurred, that finding was sound. For if relocation happened before 1917, the year that the Bassets claim common ownership of both properties began, or after 1929, the year that it purportedly ended, no "consensual change" in the location of the westerly portion of Woods Road could have occurred. And since the Bassetts, as the parties claiming the easement across the Evans lot, had the burden of proof, the circuit court was correct in concluding that they had failed to meet that burden and, therefore, that there was no basis upon which to find a "consensual change" of location.

As an alternative to its claim of identity of ownership, the Bassetts introduce a theory of "common ownership," which has no basis in Maryland law but, as we shall see, is not entirely without legal antecedents: they claim that they should have prevailed on their consensual relocation claim because during the period in which the relocation occurred, sometime between 1913 and 1938, the two properties had, if not identical ownership, at least "substantially common ownership" and that, according to the Bassetts, is enough to support their claim.

To establish "substantially common ownership" of the two properties during the critical 1913 to 1938 period, the Bassetts tack onto the period of from 1917 until 1929 when, they claim, the properties shared the same ownership, the years from 1929 until 1944 when Harrison Nurseries, Inc. owned both the Evans lot and a one half interest in the Birch Farm. This stratagem allows them to claim that, from at least 1917 to 1944, if not beyond, there was "substantially common ownership" of the two properties to support their claim of a consensual relocation of the westerly portion of Woods Road. But while urging this Court to adopt this standard of common ownership and insisting that the circuit court's "thesis that there must be absolute congruence ('unity') of record title is erroneous," they fail to cite a single legal authority in support of their position.

Moreover, the standard they ask us to adopt is no more rooted in logic than it is in law. By adopting such a standard, we would be exchanging a clear and certain standard, easily applied and ensuring uniformity of results, for an ambiguous and problematic standard, which replaces reasoned and predictable outcomes with arbitrary decisions as to when the shifting ownership of two properties reaches the level of "substantially common ownership." This is one burden we cannot justify imposing on our trial courts.

But even under such a standard, the Bassets' claim of consensual relocation fails. The shareholders of a corporation do not own the property of a corporation; the corporation

does. *Humphreys v. McKissock,* 140 U.S. 304, 312, 11 S.Ct. 779, 35 L.Ed. 473 (1891) (ownership of property "is in the corporation, and not in the holders of shares of its stock"); *see also Gibbons v. Mahon,* 136 U.S. 549, 557, 10 S.Ct. 1057, 34 L.Ed. 525 (1890)(the "property of a corporation is not subject to the control of the members, whether acting separately or jointly"). Consequently, whether or not members of the Harrison family were shareholders of Harrison Nurseries, Inc., the ownership of the Evans lot by that corporation cannot be imputed to them, as stockholders, and therefore the Birch Farm and the Evans lot cannot arguably be said to have been even under substantially common ownership during much of the period when the relocation is said to have occurred.

Finally, as noted earlier, the Bassetts' "substantially common ownership" theory is not entirely without legal antecedents. The appropriateness of such a standard, in one form or another, has been considered by other state courts in other contexts. Some have adopted it, *see, e.g., Barnes v. North Carolina State Highway Commission,* 250 N.C. 378, 109 S.E.2d 219 (1959)(there must be "substantial unity of ownership" to collect severance damages in an eminent domain proceeding), but the majority have not. *See, e.g., Stockton v. Ellingwood,* 96 Cal.App. 708, 275 P. 228 (1929)(unity of ownership is required for allowance of severance of damages); *Coatsworth v. Lehigh Valley R. Co.,* 73 Misc. 645, 131 N.Y.S. 300 (1911)(there must be identical ownership to recover severance damages). Illustrative of the majority view is *Weldon v. State,* 495 So.2d 1113 (1985). In that case, the Court of Civil Appeals of Alabama rejected what it felicitously called the "substantial unity of ownership" standard in the context of a condemnation proceeding.

In *Weldon,* the State of Alabama sought to acquire, for a highway, a strip of land that crossed three parcels of property. The three parcels, in conjunction with two others, had been used "as a single farming unit for more than forty years" and then deeded by the owner to his children. *Id.* at 1114. As the owners of those parcels would receive greater compensation

for their loss if "the entire unit" was viewed "as a single tract of land," they argued that unity of ownership did not require that each of them have the same interest in all parts of the tract. Noting that the "apparent majority of jurisdictions require that the ownership interests in each parcel must be identical in both quality and quantity, before the parcels may be claimed as a single unit," that court rejected the "substantial unity of ownership" argument in favor of a "strict unity of ownership" standard. *Id.* at 1115. The court's reasoning in doing so is not unlike the reasoning underlying the result we reach today. It stated:

> Strict unity of ownership has at least one clear advantage over the other and minority views. The rule provides a "bright-line test" that can be very easily and uniformly applied by trial judges in all cases. The other views necessitate an ad hoc approach to the law. In our review of the existing law, we could find no definitive explanation of what is meant by the phrase "substantial unity of ownership." We do not ascertain any clear way of determining in which cases a court may find that unity of ownership is necessary and in which it is not necessary.

*Id.* at 1116.

> The Court concluded:

> [I]t is evident that the lots of land in this case constitute distinct and separately owned tracts. Though the current owners of each parcel derived title from a common grantor, the affected parcels are now owned primarily by different persons. As such, the owners' argument that the parcels must be tried as a single unit must fail.

*Id.*

Having failed to establish the condition precedent of their consensual relocation claim—common ownership of the dominant and servient estates—the Bassetts, undaunted, cite *Greenwalt v. McCardell*, 178 Md. 132, 12 A.2d 522 (1940), for the proposition that the Harrisons could and did consent by acquiescence to the relocation of the westerly portion of Woods Road. In that case, Greenwalt filed a complaint for

injunctive relief to restrain neighbors from using a portion of a private roadway running through his property to a public road. That property had been acquired by Greenwalt from Edgar and Clara Lines, who owned a much larger neighboring farm. The Lines' farm had a private road running through it. When the Lines conveyed part of their farm to Greenwalt, the deed also granted him the right to use the roadway " 'as means of ingress and egress to and from the land hereby conveyed' " to the public road. *Id.* at 135, 12 A.2d 522. At that time, neighboring property owners, the McCardells, were also granted a right-of-way in the same private road.

As a result of substantial rain damage to the roadway, Greenwalt "dug 'back into the bank' a distance of about four feet to 'seek more of level and get away from the ravine.' " *Id.* at 136, 12 A.2d 522. Unknown to him, his efforts to mend the roadway had resulted in the relocation of a portion of the roadway onto his property so that when the McCardells' used the roadway, they passed over Greenwalt's property. To end what he considered to be trespassing by the McCardells, Greenwalt filed suit to enjoin the McCardells from using the portion of the roadway that was now on his property. The circuit court dismissed his complaint. Affirming that decision, the Court of Appeals held:

> [T]he assertion of [Greenwalt] that he had shifted the roadbed for his convenience does not have the effect of making the [McCardells] trespassers. After an easement has been established, its location should not be changed by either party without the other's consent. But if a way has been slightly and not materially changed, and the owner of a dominant estate has used it for several years, his acquiescence will be presumed; and the changes do not invalidate the rights of the persons who are entitled to use the way.

*Id.* at 137, 12 A.2d 522.

In *Greenwalt,* unity of ownership was not at issue. In that case, the question was not whether consent by acquiescence to an easement relocation could have been given, as in the instant case, but whether, in fact, it was. Therefore, the Court of

Appeals, in that case, addressed only the question of when the conduct of a property owner does constitute such consent. It declared that acquiescence will be presumed only if the right-of-way "has been slightly and not materially changed, and the owner of [the] dominant estate has used it for several years." *Id.* at 137, 12 A.2d 522.

But that is not what occurred here. In contrast to *Greenwalt*, where the shift in the location of the right-of-way was a mere four feet and no change in its traditional use was requested or even contemplated, at issue here is a two hundred foot shift in location and a demand for a significant change in use: hardly a "slight" and "immaterial" change in location and use. Consequently, *Greenwalt* not only presents a different issue than the instant case does, but a different and distinguishable set of facts as well. Indeed, if it offers any precedental guidance at all here, it is to suggest, by negative implication, that when an easement undergoes a material change in location or use, consent by acquiescence cannot be presumed.

The Bassetts also contend that they acquired an easement across the Evans lot by equitable estoppel. They argue that it "would be grossly unfair to preclude usage of what has long been recognized and used by the present and former owners of the Bassett Farm as the relocated road right-of-way granted by the 1913 deed with the reasonable expectation that their right to use the road would not be diminished." We disagree.

Under Maryland law, equitable estoppel does not apply "unless it is shown that the person sought to be estopped has been guilty of some wrongful or unconscientious conduct upon which another relied, and was misled to his [or her] injury." *Peruzzi Brothers, Inc. v. Contee,* 72 Md.App. 118, 128, 527 A.2d 821 (1987). No such evidence was ever presented in this case. Moreover, the Bassetts did not raise this argument below and are therefore precluded from doing so now. Md. Rule 8–131(a).

## II.

The Bassetts contend that the Harrisons admitted in their initial complaint, and in the two amended complaints that followed, that the right-of-way at issue was relocated so that it crossed the Evans lot. In Paragraph 9 of both the initial complaint and the first and second amended complaints, the Harrisons assert that "the westerly terminus of the old Woods Road which is the alleged right-of-way was moved" and "[t]herefore the westerly terminus (at its intersection with Maryland Route 113) which is the old 1913 right-of-way, is grown with mature timber." Although the circuit court allowed the Harrisons to delete this statement at trial in a third amended complaint, the Bassetts argue that "by virtue of having several times alleged that the road 'right-of-way' had been relocated ('moved'), those '[u]nequivocal statements in the effective pleadings filed on a party's behalf constitute binding judicial admissions.'" While "[u]nequivocal statements" in a complaint can constitute binding judicial admissions, *Kramer v. Globe Brewing Co.*, 175 Md. 461, 467–68, 2 A.2d 634 (1938), that is not what happened here. The statement in question was no more than an acknowledgment by the Harrisons that the "western terminus" of Woods Road had been moved; not, as the Bassetts maintain, an admission by them that they had granted the Bassetts an easement across the Evans lot. In any event, the court permitted the Harrisons, pursuant to Maryland Rule 2–341(b), to file a third amended complaint during trial, which deleted this statement, thereby disposing of this issue.

## III.

In support of their claim that the 1913 deed does not bar the use of the right-of-way to service more than the 72 acres conveyed by that deed, the Bassetts first point out that the 1913 deed contains "no express limitation of its potential use." That being so, they maintain that there is no "plausible basis to infer that the parties intended the right-of-way granted by the 1913 deed to be limited." Consequently, the grant

of the right-of-way at issue should have been "construed in favor of broad usage." Such a construction, had it not been rejected by the circuit court, would have of course permitted them to use the right-of-way to service their entire farm and not just the 72 acres conveyed to William D. Bassitt in the 1913 deed.

After describing the 72 acres that were to be conveyed, the deed states:

> Also a right-of-way is hereby granted from the end of the first line of this survey of a roadway, leading to the main drive road out from the farm to the main County Road, running to the west of the farm buildings, Also the privilege of drainage through and across the Harrisons' Bay field to the creek, Also that the present wire fence, dividing the properties shall remain where it now stands, marking the second, third and a portion of the third line of this survey- And the said Orlando Harrison and George A. Harrison, reserve all of the timber as laid down on a plat of this survey, and are to be allowed twelve months time from this date to remove the same over said lands.

■■ Initially, we note that the "primary rule for the construction of contracts generally—and the rule is applicable to the construction of a grant of an easement—is that a court should ascertain and give effect to the intention of the parties at the time the contract was made, if that be possible." *Buckler v. Davis Sand and Gravel Corporation*, 221 Md. 532, 158 A.2d 319 (1960). But what if, as in the instant case, the intention of the parties was not spelled out in the deed or in any other document and is now not "ascertainable" because of the passage of time? To answer that question, we turn to the Court of Appeals' decision in *Buckler v. Davis Sand and Gravel Corporation*, 221 Md. 532, 158 A.2d 319 (1960).

In that case, Buckler conveyed by deed to Davis Sand and Gravel Corporation ("Davis Sand"), a tract of land ("Buckler Tract") consisting of over twenty-five acres of sand and gravel deposits. At the time of the conveyance, Davis Sand was engaged in mining sand and gravel and had "several other

'holdings' of sand and gravel pits adjacent to the Buckler Tract." *Id.* at 535, 158 A.2d 319. The deed also "granted to [Davis Sand] a 45–foot easement across other land of the grantors from the public highway to the Buckler Tract." *Id.* With respect to that easement, the deed stated:

> " 'The right-of-way is granted and conveyed for only so long as the grantee, its successors or assigns, mines the * * * [Buckler Tract] and its or their holdings of adjacent property as a sand and gravel pit.[6] It is intended that upon a failure of the grantee, its successors and assigns, to use the said right-of-way in conjunction with its or their mining operations for a period of longer than one year then, and in that event, the property of the [grantors], their heirs and assigns, shall be unencumbered by said right-of-way without the necessity of any act on their part to terminate said right-of-way.' "

*Id.* at 535, 158 A.2d 319.

Less than six months after it had purchased the Buckler Tract, Davis Sand acquired another tract of sand and gravel deposits ("Goddard Tract") "adjoining the other land of [Buckler], on which it constructed a sand and gravel processing plant." *Id.* at 535, 158 A.2d 319. "It [was] in this plant on this after acquired tract that all sand and gravel from the original tract and pits was processed and in which the sand and gravel from other after acquired pits is now being processed." *Id.*

Thereafter, Buckler challenged the right of Davis Sand "to continue use of the easement [to mine adjacent land] and, when it refused to desist," suit was filed. *Id.* at 536, 158 A.2d 319. At trial, Buckler maintained that it was entitled to enjoin Davis Sand from "subjecting the easement to the increased burden." *Id.* Davis Sand countered by claiming "that because it [was] still operating the processing plant on the adjoining

---

6. Although not dispositive of this issue in *Buckler,* we find it worth mentioning that the deed in the present case, unlike the deed in *Buckler,* does not expressly provide that the right-of-way can be used to mine the holdings of adjacent property as a sand and gravel pit.

after acquired Goddard Tract and [was] still mining sand and gravel on the after acquired holdings of 'other' adjacent property, it [was] entitled to continue to use the easement." *Id.* at 536, 158 A.2d 319. The circuit court agreed with Davis Sand and held "that the defendant had a right to use the easement so long as it, and its successors or assigns, continued to mine sand and gravel on any of 'its or their holdings' of property adjacent to the Buckler Tract—regardless of when such holdings were acquired." *Id.* at 536–37, 158 A.2d 319. But the Court of Appeals disagreed.

Declaring that the grant of an easement by deed "should [be] strictly (not liberally) construed," *id.* at 538, 158 A.2d 319 (quoting *Dickson v. Arkansas Louisiana Gas Co.*, 193 So. 246 (La.App.1939)), the Court of Appeals held that an "easement appurtenant to a lot cannot be used for the purpose and benefit of another lot to which no right is attached even though such other lot be adjoining that to which the easement belongs." *Id.* at 538, 158 A.2d 319 (citing *Albert v. Thomas*, 73 Md. 181, 20 A. 912 (1890)). It therefore concluded that Davis Sand was not entitled to use the easement as the means of ingress to and regress from the after acquired Goddard Tract. *Id.* at 539, 158 A.2d 319.

As directed by the *Buckler* Court, we must strictly construe the grant of the right-of-way at issue by the 1913 deed. In doing so, we note that nowhere in that deed is there any indication that the right-of-way was ever intended to serve more than the 72 acres conveyed. Moreover, a right-of-way ordinarily "cannot be used for the purpose and benefit" of more than the land conveyed by the deed, even though that land may "adjoin[ ] that to which the easement belongs." *Buckler*, 221 Md. at 538, 158 A.2d 319. We therefore conclude that the circuit court was correct in holding that the right-of-way at issue was not intended to serve more than the original 72 acres conveyed by the 1913 deed.

The Bassetts next contend that using the entire right-of-way as a "haul road" for sand and gravel will not unreasonably burden the Harrisons' property, and, therefore, the circuit

court erred in holding that such a use was unwarranted. They point out that the Harrisons' neighbor, Randy Hastings, currently uses the road to haul such material from his borrow pit and maintain that Hale Harrison's testimony that using the right-of-way to haul sand and gravel would devalue and adversely impact their farm was "grossly speculative." What constitutes an unreasonable increase in the use of an easement was addressed by the Court of Appeals in *Chevy Chase Land Company v. United States,* 355 Md. 110, 733 A.2d 1055 (1999). In that case, a right-of-way that had originally been obtained by a railroad for shipping freight was sold to Montgomery County. The County intended to convert it into a hiking and biking trail. In determining whether a change in the use of a right-of-way constituted an unreasonable burden on the servient estate, the Court of Appeals declared that the test was "whether the change is so substantial as to result in the creation and substitution of a different servitude from that which previously existed." "In other words," the Court continued, "if the alteration is merely one of quality and not substance there will be no resulting surcharge to the servient estate." *Id.* at 152, 733 A.2d 1055 (citations omitted).

Applying that test, the Court found it "self-evident that the use of the right-of-way as a transportation corridor for walking, biking, and other transportation purposes, including its possible use in the future for light rail, imposes no new burdens on the servient tenements and does not result in the 'substitution of a different servitude from that which previously existed.'" *Id.* Indeed, the Court held that "recreational trail use of the land is compatible and consistent with its prior use as a rail line, and imposes no greater burden on the servient estates." *Id.* (internal quotations omitted). In fact, the Court noted, the change of use in the instant case was "considerably less burdensome ... than the use required by a freight train." *Chevy Chase Land,* 355 Md. at 152, 733 A.2d 1055.

In contrast to *Chevy Chase,* there was sufficient evidence for the circuit court to conclude, as it did, that Bassett's proposed use of Woods Road to haul sand and gravel from a borrow pit was not compatible and consistent with its previous

use and constituted an increase in the burden on the servient estate. Indeed, Hale Harrison testified, not unreasonably, that "dump trucks" going back and forth on their property, over which they would have "no control or supervision," would "devalue[ ] and adversely impact[ ]" their farm. The circuit court understandably agreed.

## IV.

The Bassetts contend that they acquired a prescriptive easement in the entire Woods Road (Segments 1 and 3), which permits them to use it as a haul road for their borrow pit. They point out that Woods Road has been used for decades for travel between the Bassett farm and the main road (now U.S. Route 113) "by both general traffic and trucks hauling grain, fertilizer and chicken feed to and from the farm" and that that easement is not limited to its prior use. Citing *Mahoney v. Devonshire,* 86 Md.App. 624, 587 A.2d 1146 (1991), the Bassetts claim that Maryland has adopted the "enlightened approach" for determining the scope of a prescriptive easement. That approach recognizes that the " 'normal evolution in the use of the dominant tenement' permits a reasonable increase in the burden on the servient tenement." *Id.* at 634, 587 A.2d 1146 (quoting *Bodman v. Bodman,* 456 Pa. 412, 321 A.2d 910 (1974)). And, they claim, the hauling of sand and gravel over Woods Road would be such a "reasonable increase" and in accordance with the "normal evolution" in the use of their property. Moreover, they assert that the Harrisons introduced no evidence that the use of the right-of-way as a haul road would adversely affect them, that their property would decline in value, or that the increase in traffic would generally have a deleterious affect. They further point out that the Harrisons currently allow another neighbor, Randall Hastings, to use it as a haul road.

In *Mahoney,* six corporations owned a common piece of property, adjacent to the Mahoneys' land. The corporations used a roadway, traversing the Mahoneys' property to obtain access to their property. To prevent further use of that roadway, the Mahoneys erected gates across it. In response,

the corporations filed both a declaratory judgment action and an action for injunctive relief seeking to enjoin the Mahoneys from interfering with their use of the roadway.

Holding that the corporations had a prescriptive easement in the roadway, the circuit court granted the corporations' request for injunctive relief. Affirming that decision, this Court addressed for the first time the question of what the proper scope of a prescriptive easement was. In doing so, we adopted, as noted by the Bassetts, the "enlightened approach" test for determining the scope of a prescriptive easement, declaring that the "normal evolution of the dominant tenement permits reasonable increases in the burden imposed upon the servient tenement." *Id.* at 634–35, 587 A.2d 1146 (quoting *Hash v. Sofinowski*, 337 Pa.Super. 451, 487 A.2d 32 (1985)); *see also, Bodman v. Bodman*, 456 Pa. 412, 321 A.2d 910 (1974); *Hill v. Allan*, 259 Cal.App.2d 470, 66 Cal.Rptr. 676 (1968); *Kuras v. Kope*, 205 Conn. 332, 533 A.2d 1202 (1987).

Affirming the circuit court, we stated:

The court found the right-of-way to be 16 feet wide and that appellees could repair and maintain the roadway. This finding was supported by evidence in the [original] deed that the roadway was 16 feet wide. It was also supported by testimony by one of the [corporation's predecessors-in-title] that fences were erected along the roadway at a width of from 18 to 20 feet in order to accommodate farm equipment which regularly traveled the roadway. Further, it was not erroneous to permit the increased use of the roadway. It was foreseeable that the property of appellees would be subdivided and the right-of-way required to bear an increased burden of use. The use permitted by the trial court was not unreasonable based on evidence of past use. The burden on the servient estate is appropriate. We perceive no error in the trial court's decision.

*Mahoney*, 86 Md.App. at 638, 587 A.2d 1146.

Applying that principle, we hold that use of Segment 3 of the right-of-way to haul sand and gravel to and from their "borrow pit" would not be a "reasonable increase" in the use

of that segment, which had been previously used only for personal and agricultural purposes during the prescriptive period and beyond.

### Cross–Appeal
### V.

■ On cross-appeal, the Harrisons contend that the circuit court erred in granting appellants a prescriptive easement across the Evans lot as there was no evidence that the Bassetts' use of the easement was adverse. They point out that Hale Harrison testified that he never saw appellants utilize any segment of Woods Road prior to giving appellants permission to use it, that Hale Harrison gave the Bassett family a key to a gate located on Segment 3 as a "courtesy," and that he gave the Bassetts "permission to hunt the Birch Farm and utilize the Woods Road." By asking permission to use the Harrisons' land, the Bassetts, according to the Harrisons, recognized the right of the Harrisons to stop their use of the right-of-way and hence their use of it was not adverse.

That Hale Harrison never saw the Bassetts use the Woods Road and that in 1994 he gave the Bassett family a key to the gate is irrelevant, because those acts occurred after the prescriptive easement matured. As noted earlier, it is undisputed that the relocation of Segment 3 occurred no later than 1938. And there is sufficient evidence that the Bassetts and the earlier owners of the farm adversely used the property well beyond the 20 year prescriptive period of from 1938 to 1958. For example, Floyd Bassett testified that he used the Woods Road for hunting with other members of the Bassett family during the 1940's and 1950's. Moreover, Clive Bassett, Robert Bassett's father, who owned the farm from 1947 until his death, farmed the land and used the road for that purpose. And beginning in the early 1960s, Connie Bassett testified that the Bassetts continued to use the road to haul grain and feed to or from the entire farm.

### VI.

■ The Harrisons contend that the circuit court erred in granting the Bassetts a prescriptive easement across the

Evans lot because the Bassetts "did not properly plead a cause of action for prescriptive easement, either as a counter-claim or as a defense." Indeed, the only mention of a prescriptive easement is in the Bassetts' answer to the Harrisons' second amended complaint. It states simply "that they have acquired a prescriptive easement." The Harrisons therefore claim that the Bassetts failed to properly plead a prescriptive easement.

The Harrisons filed this action to obtain a declaration of their rights and enjoin the Bassetts from using Woods Road. An easement by prescription is not among the twenty-one affirmative defenses required to be pled in an answer by Rule 2–323(g). *See Ben Lewis Plumbing v. Liberty Mutual Ins., Co.,* 354 Md. 452, 731 A.2d 904 (1999)(noting that because negligent misrepresentation is not separately listed under Rule 2–323(g) it is not required to be plead as an affirmative defense). Because the Bassetts were under no duty to plead prescriptive easement as an affirmative defense, they did not lose the right to claim such an easement below. Moreover, in an action requesting a declaratory judgment, the court is required to declare the rights, duties, obligations and status of the parties unconstrained by their allegations, contentions and arguments.

**JUDGMENT AFFIRMED.**

**COSTS TO BE SHARED EQUALLY BY THE PAR-TIES.**

## App. 1

Point A is 600 feet, more or less, from U.S. Route 113. E 437
Point B is one mile, more or less, from U.S. Route 113. E 479

Numbers 1, 2 and 3 are "segments" as designated by the Circuit Court, E 484.